HOWARD Y. HUNTSBERRY AND MARGARET N. HUNTSBERRY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 28038–81. Filed November 26, 1984.

*Gerald V. Walsh,* for the petitioners.
*William V. Spatz,* for the respondent.

## OPINION

RAUM, *Judge*: The Commissioner determined a $24,612.75 deficiency in petitioners' 1979 Federal income tax. The sole issue is whether petitioners are liable for the alternative minimum tax imposed by section 55, I.R.C. 1954. The facts have been stipulated.

Petitioners Howard Y. Huntsberry and Margaret N. Huntsberry, husband and wife, resided in Coral Gables, FL, when they filed the petition herein. They filed their joint Federal income tax return for the taxable year 1979 with the Internal Revenue Service Center, Chamblee, GA.

Petitioners' 1979 Federal income tax return reported gross income of $192,490, itemized deductions of $8,103, and three personal exemptions, and showed the following tax liability as reduced by tax credits:

| | |
|---|---:|
| Tax before credits | $79,826 |
| Reduced by: | |
| Credit for contribution to candidates | (13) |
| Investment tax credit | (2,096) |
| Jobs credit | (69,945) |
| Residential energy credit | (38) |
| Total 1979 Federal income tax | 7,734 |

It disclosed no tax preferences as defined by sections 55(b)(1)(C) (now sec. 55(b)(2)) and 57, I.R.C. 1954, nor indicated any liability for the alternative minimum tax.

The Commissioner did not challenge the correctness of any item of income, deduction, or credit shown on petitioners' return. However, on December 30, 1980, he sent petitioners a letter which stated, in part: "Your [1979] return indicates Form 6251, Alternative Minimum Tax Computation, was due. Please fill one out and send it to us." Petitioners thereafter returned a partly completed Form 6251 on which they had entered the appropriate amounts on those lines used for determining "alternative minimum taxable income," and thus reported $181,387 of such income, but left blank or entered the word "none" on those lines reserved for computing the amount of tax due with respect to such income. Had petitioners completed the form in accordance with its accompanying instructions, they would have reported an alternative minimum tax of $24,612.75, the amount of the deficiency herein. In making his determination, the Commissioner again accepted as correct all of the items of income, credits, and deductions appearing on petitioners' return, as well as the $181,387 "alternative minimum taxable income" appearing on their partly completed Form 6251.

Section 55(a)[1] imposed upon noncorporate taxpayers "a tax

---

[1]Unless otherwise indicated, references to various provisions of the Code are intended to relate to such provisions as were in effect for the year 1979. Sec. 55(a) and (b)(1) then read as follows:

SEC. 55. ALTERNATIVE MINIMUM TAX FOR TAXPAYERS OTHER THAN CORPORATIONS.
(a) ALTERNATIVE MINIMUM TAX IMPOSED.—In the case of a taxpayer other than a corporation, if—
(1) an amount equal to the sum of—
(A) 10 percent of so much of the alternative minimum taxable income as exceeds $20,000 but does not exceed $60,000 plus
(B) 20 percent of so much of the alternative minimum taxable income as exceeds $60,000 but does not exceed $100,000, plus
(C) 25 percent of so much of the alternative minimum taxable income as exceeds $100,000, exceeds
(2) the regular tax for the taxable year, then there is imposed (in addition to all other taxes imposed by this title) a tax equal to the amount of such excess.
(b) DEFINITIONS.—For purposes of this section—
(1) ALTERNATIVE MINIMUM TAXABLE INCOME.—The term "alternative minimum taxable income" means gross income—
(A) reduced by the sum of the deductions allowed for the taxable year,
(B) reduced by the sum of any amounts included in income under section 667, and
(C) increased by an amount equal to the sum of the tax preference items for—
(i) adjusted itemized deductions (within the meaning of section 57(a)(1)), and
(ii) capital gains (within the meaning of section 57(a)(9)).

equal to the amount" by which the sum of specified percentages of "alternative minimum taxable income" (at graduated rates) "exceeds * * * the regular tax for the taxable year." Section 55(b)(1) defined "alternative minimum taxable income" as a taxpayer's gross income reduced by all allowable deductions and by amounts included in income under section 667 (accumulated distributions to trust beneficiaries), and increased by the sum of the two tax preference items for "(i) adjusted itemized deductions (within the meaning of section 57(a)(1)), and (ii) capital gains (within the meaning of section 57(a)(9))." The percentages of alternative minimum taxable income to be compared to the "regular tax" were set forth by section 55(a)(1), as follows:

(A) 10 percent of so much of the alternative minimum taxable income as exceeds $20,000 but does not exceed $60,000 plus
(B) 20 percent of so much of the alternative minimum taxable income as exceeds $60,000 but does not exceed $100,000, plus
(C) 25 percent of so much of the alternative minimum taxable income as exceeds $100,000 * * *

The "regular tax for the taxable year" was defined by section 55(b)(2), as follows:

the taxes imposed by * * * [chapter 1] for the taxable year (computed without regard to this section and without regard to the taxes imposed by sections 72(m)(5)(B), 402(e), 408(f), 409(c) and 667(b)) *reduced by the sum of the credits* allowable under subpart A of part IV of this subchapter (other than under sections 31, 39 and 43). [Emphasis supplied.]

Thus, although tax preferences may play a part in the computation of the alternative minimum tax, that tax is not a tax on preference items but is rather an "add on" tax which is imposed whenever the sum of statutory percentages of "alternative minimum taxable income" exceeds the "regular tax" for the taxable year. More important, because alternative minimum taxable income may be close to or at least equal to net taxable income (computed by subtracting all deductions and personal exemptions from gross income) an individual taxpayer may be liable for the alternative minimum tax whenever tax credits reduce his regular tax below the amount calculated by applying the section 55(a)(1) percentages to his alternative minimum taxable income, notwithstanding that the taxpayer claimed no tax preferences.

Accordingly, if the statute is followed according to its detailed terms, a taxpayer may be liable for the "alternative minimum tax" imposed by section 55 even though he may not have claimed any tax preferences. And that is precisely the situation in the instant case. As noted above, petitioners' regular tax before credits was $79,826 which was reduced to $7,734 as a consequence of four credits, primarily a jobs credit of $69,945. On the other hand, application of the specified statutory percentages (sec. 55(a)(1), *supra*) to petitioners' undisputed $181,387 "adjusted minimum taxable income" produced the following result:

| | |
|---|---|
| (A) 10% of $40,000 | $4,000.00 |
| (B) 20% of $40,000 | 8,000.00 |
| (C) 25% of $81,387 (181,387 − 100,000) | 20,346.75 |
| Total | 32,346.75 |

The $32,346.75 figure thus computed is substantially in excess of petitioners' "regular tax" of $7,734, with the result that section 55(a) imposed "a tax equal to the amount of such excess," namely, $24,612.75 as the "alternative minimum tax." That is also the result reached by scrupulously following Form 6251 which, in turn, follows the statutory provisions.

Petitioners initially attempted to justify their failure to complete the Form 6251 in accordance with its instructions by referring to a periphrastic double negative explanation on their original tax return which read:

Taxpayer has computed his alternative minimum tax in a manner that deviates from the regulations. Taxpayer does not deem it proper to fail to offset jobs tax credit from the alternative minimum tax.

Petitioners have since conceded that Form 6251 conforms to a literal reading of the statute, that "If one follows the Code, you reach the conclusion that the Respondent has reached," and that "The form specifically tracks the Code." Their principal contention now, however, is that no calculations whatever should have been made in the first place, because, in their view, section 55 is simply inapplicable where, as here, a taxpayer claims no items of "tax preference." They do not point to any language in section 55 that specifically so states, but they find comfort in what they perceive to be the purpose of section 55 as disclosed by legislative history. We hold that

there is no solid basis in the legislative history or otherwise for refusing to apply section 55 as written, and we sustain the Commissioner.

(1) Because of its relationship to various other arguments made by petitioners, we consider preliminarily the position originally taken by them on their return and in their petition filed herein, namely, that they were entitled "to offset.jobs tax credit from the alternative minimum tax."[2] However, petitioners' position is unsound. Section 55(c)(1) makes abundantly clear that credits other than foreign tax credits are not allowable against the alternative minimum tax.[3]

Section 55, which imposed the alternative minimum tax, was added to the Code by section 421 of the Revenue Act of 1978, Pub. L. 95–600, 92 Stat. 2763, 2871. In the report of the Conference Committee on the bill which subsequently became that act, there is an explicit statement, obviously referring to section 55(c)(1), to the effect that only the foreign tax credit of all the "nonrefundable"[4] credits may be taken against the alternative minimum tax. The committee stated (H. Rept. 95–1800, at 267 (1978), 1978–3 C.B. (Vol. 1) 521, 601):

the foreign tax credit is to be allowed against the alternative minimum tax. However, individuals paying the alternative minimum tax are not to obtain the benefit of nonrefundable credits other than the foreign tax credit to the extent of that individual's alternative minimum tax.

---

[2]Their so-called jobs tax credit, accepted by the Commissioner, was in the amount of $69,945.
[3]Sec. 55(c)(1) provides:

(c) CREDITS—
   (1) CREDITS OTHER THAN THE FOREIGN TAX CREDIT NOT ALLOWABLE.—For purposes of determining the amount of any credit allowable under * * * [secs. 31, 32, 37, 38, 39, 40, 41, 42, 43, 44, 44A, 44B, 44C and 45], the tax imposed by this section shall not be treated as a tax imposed by this chapter.
[4]The terms "refundable" and "nonrefundable" as applied to credits do not appear in the statute, but are freely used by the congressional committees and commentators. Thus, the word "refundable" in this context generally refers to credits which are really not "credits" in the ordinary sense, but reflect *payments* already made (or amounts available for payments) that are allocable to the tax, such as the familiar quarterly payments of estimated tax, withholding, and the like. Such "credits" are separately shown on the Form 1040 for 1979 as "Payments" that are applicable to discharge pro tanto the tax liability as finally computed on the return *after* taking the ordinary allowable credits into account. They are called refundable "because the amounts involved would be available as refunds to the taxpayer in any event." H. Rept. 95–1445, at 123 (1978), 1978–3 C.B. (Vol. 1) 181, 297. See sec. 6401(b), I.R.C. 1954. The term "nonrefundable" is used to refer to all the familiar credits such as the foreign tax credit, the investment credit, the jobs credit, and other credits of like general character. No refund is available in respect of such credits even if they should exceed the tax.

Similarly, in a "General Explanation of the Revenue Act of 1978," prepared for the Joint Committee on Taxation, it is stated (Joint Committee Print, Mar. 12, 1979, at 263):

> The foreign tax credit and refundable credits are the only tax credits which are allowed against any alternative minimum tax liability. Thus, taxpayers paying the alternative minimum tax do not obtain the benefit of nonrefundable credits, other than the foreign tax credit, to the extent of the minimum tax.

Indeed, in recognition of the unavailability of both the jobs credit and the investment credit against the alternative minimum tax, section 55(c)(3)(A) and (C) provides for carry-backs and carryovers of such credits.

There is no merit whatever to the position taken by petitioners on their return and in their petition herein.

(2) We now proceed to consider petitioners' new and principal contention that they were entitled to ignore the provisions of section 55 imposing the alternative minimum tax, on the theory that section 55 was never intended to apply to them at all since they had no "tax preferences." The legislative history, they contend, establishes that Congress intended section 55 to be operative only where a taxpayer had "tax preferences." The Government opposes resort to legislative history where the statute is clear on its face, and we do not understand petitioners to contest the clear applicability of section 55 if calculations are made according to its terms; indeed, as already noted, *supra* p. 745, they have conceded otherwise. However, we reject the Government's position to the extent that it would preclude us from examining the legislative history.

Although there was at one time a fairly clear rule foreclosing any inquiry into legislative purposes where a statute is clear on its face, there has been a gradual erosion of that rule (see, e.g., *United States v. American Trucking Associations*, 310 U.S. 534, 543–544 (1940); *J.C. Penny Co. v. Commissioner*, 312 F.2d 65, 68 (2d Cir. 1962)), and this Court has followed the lead of the Supreme Court's decision in *American Trucking Associations*. See, e.g., *Carasso v. Commissioner*, 34 T.C. 1139, 1142 (1960), affd. 292 F.2d 367 (2d Cir. 1961). Nevertheless, where a statute is clear on its face, we would require unequivocal evidence of legislative purpose before construing the statute so

as to override the plain meaning of the words used therein. And this is particularly so in a case like the present, where we have a complex set of statutory provisions marked by a high degree of specificity. Cf. *Occidental Petroleum Corp. v. United States*, 231 Ct. Cl. 334, 685 F.2d 1346, 1348 (1982).

The concept of an "alternative minimum tax" as embodied in section 55 first appeared in the Code in 1978 (applicable only to tax years beginning after December 31, 1978). However, a proper analysis of the role played by it and "tax preferences" must begin with an examination of the "minimum tax" in respect of "tax preferences" which first became law some 9 years earlier.

Section 301 of the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 487, 580, added sections 56 through 58 to the Code which imposed upon all taxpayers—corporate and noncorporate alike—a "minimum tax" in respect of "tax preferences." In general, the tax was equal to 10 percent of the amount (if any) by which the sum of "tax preferences" in excess of $30,000 was greater than the tax as otherwise computed.[5] The "alternative minimum tax" involved herein is imposed only on noncorporate taxpayers. Although the term "alternative minimum tax" is confusingly similar to the term "minimum tax" already on the books for some 9 years, it nevertheless relates to a separate and distinct tax. Indeed, during 1979 and for several years thereafter, a noncorporate taxpayer was subject to *both* the

---

[5]By the time the "alternative minimum tax" was introduced into the Code by sec. 421(a) of the Revenue Act of 1978, the "minimum tax" had undergone certain changes. The rate had been raised to 15 percent and was applied to a base equal to the excess of "tax preferences" over the greater of $10,000 or the "regular tax deduction." The latter, a new concept, was defined in sec. 56(c) to be equal generally, in the case of corporate taxpayers, to the regular tax reduced by certain credits, and in the case of noncorporate taxpayers, to one-half the regular tax reduced by such credits. The "minimum tax" remained, nevertheless, a tax on: "tax preferences," and by its very structure no "minimum tax" was applicable unless there were "tax preferences." The listing of items of "tax preferences" in sec. 57 underwent some changes, including additions and modifications, but continued to be concerned with such items as accelerated depreciation, amortization of specified facilities, stock options, reserves for bad debt losses of financial institutions, depletion, and capital gains. A new "tax preference" in the form of "adjusted itemized deductions," in the case of individuals, had meanwhile appeared. Sec. 301(c), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520, 1550. However, sec. 421(b)(2) of the Revenue Act of 1978, 92 Stat. 2763, 2874, provided in substance that, in the case of individuals, for purposes of the "minimum tax" imposed by sec. 56, such "adjusted itemized deductions" and "capital gains" shall not be treated as items of tax preference. The significance of the elimination of those two items in respect of the "minimum tax" will be commented upon hereinafter in connection with the new "alternative minimum tax" that was simultaneously imposed by sec. 55 of the Code, as added by sec. 421(a) of the Revenue Act of 1978.

minimum tax and the alternative minimum tax.[6] It is important that the differences between these two taxes be kept clearly in mind. To some extent, they have similar, but nevertheless at least partly different, objectives, and they are differently structured and have independent spheres of operation.

The "minimum tax" is admittedly a tax on "tax preferences," so that, if a taxpayer has no tax preferences, no minimum tax is due. The "alternative minimum tax" originally grew out of a congressional perception that "in the case of capital gains, the present minimum tax has adversely affected capital formation." H. Rept. 95–1445, at 122 (1978), 1978–3 C.B. (Vol. 1) at 296. The bill providing for the enactment of the "alternative minimum tax" underwent a number of fundamental changes at each stage of its progression from the House to the Senate and lastly to the Conference Committee. As finally adopted, the bill retained the existing minimum tax with respect to all preference items except capital gains and "excess" or "adjusted itemized deductions," and, as thus modified, it continued to apply to all taxpayers—corporate and noncorporate alike. It nevertheless remained a tax on tax preferences. The alternative minimum tax, on the other hand, was structured quite differently. As already pointed out, *supra* p. 744, the tax was determined by applying graduated rates to "alternative minimum taxable income"—a new concept, in which two of the preferences (capital gains and adjusted itemized deductions) were merely some (but not necessarily indispensable) components. The result obtained by applying such graduated rates was then to be compared with the regular tax (computed after taking into account such credits as the jobs and investment credits), and the excess was the amount of alternative minimum tax imposed by the statute.

It is quite true that throughout the consideration of the alternative minimum tax by the House, Senate, and Conference Committees, there were repeated references to "tax preferences" in one form or another.[7] And it is also true that

---

[6]As a result of sec. 201 of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97–248, 96 Stat. 324, 411, the "minimum tax" was repealed as to noncorporate taxpayers and the "alternative minimum tax" was restructured for tax years beginning after Dec. 31, 1982.

[7]Since the bill did go through fundamental changes at each stage of its consideration, a note of caution is necessary in evaluating statements made in the committee reports. In determining what weight to give such statements, the statements should be examined in the light of the particular

750

one of the goals of the new tax was to encourage "capital formation and economic growth"—a goal that was concerned with the capital gains tax preference. However, there was emphasis at the same time upon another goal, namely, "tax equity." See, e.g., S. Rept. 95–1263, *supra* at 201, 1978–3 C.B. (Vol. 1) at 499.[8] Moreover, it is also true that in some of the discussions of the bill there is the suggestion that the tax is to be applicable only where there are "tax preferences." See S. Rept. 95–1263, *supra* at 201–202, 204, 1978–3 C.B. (Vol. 1) at 499–500, 502. But these statements must not be taken out of context; they were made without any indication whatever that the committees were then focusing upon the possible effect that tax credits might have in the computation that was explicitly provided for in the bill itself.

The committees were, of course, aware of tax credits and were careful to make sure that such credits, except as specified, were not to be taken *against* the alternative minimum tax as finally computed. But the nub of the matter before us is the effect that tax credits have upon the *regular tax*, which must be compared with the tentative alternative minimum tax as computed in accordance with the graduated rates as applied to "alternative minimum taxable income." For, if the regular tax is reduced by such credits, then the net final alternative minimum tax is increased by a like amount, since it is equal to the excess over the regular tax as reduced by the

version of the bill that was before the committee in question. Thus, when the bill was before the House Ways and Means Committee, it did indeed provide for a tax on one tax preference, namely, capital gains. Again, when it was before the Senate Finance Committee, the minimum tax was to be repealed as to noncorporate taxpayers, and the new alternative minimum tax to be imposed upon the "alternative minimum taxable income" of noncorporate taxpayers was so structured as to take into account all tax preferences. The Conference Committee version of the bill was plainly a compromise that retained the minimum tax for noncorporate taxpayers, measured by all the tax preferences, except capital gains and excess or adjusted itemized deductions; at the same time, it retained the structure of the Senate version, imposing the alternative minimum tax upon "alternative minimum taxable income" in which only two tax preferences (the two that were excluded from the computation of the minimum tax) played a potential part in the computation of "alternative minimum taxable income." Significantly, however, nothing in the newly formulated provisions required that there be present either or both of such tax preferences. In fact, the computation finally adopted was capable of standing on its own even in the absence of both of such preferences, and did indeed serve to further the second legislative objective or goal of the new tax, namely, tax equity, even in the absence of either or both of such preferences.

[8]It is interesting to note that several years later, in considering the two taxes, the Senate Finance Committee referred with increased emphasis to "one overriding objective: no taxpayer with substantial economic income should be able to avoid all tax liability by using exclusions, deductions *and credits* (emphasis supplied), and it at the same time stated that "The ability of high-income individuals to pay little or no tax undermines respect for the entire system." S. Rept. 97–494, at 108 (1982).

credits. However, on the few occasions where the committees were referring to the new tax as being imposed on tax preferences, there is no indication at all that they were making such statements in a context that took into account the effect of tax credits in the computation of the regular tax, which in turn affects the amount of alternative minimum tax.

We cannot find that any consideration whatever was given to the part that tax credits might play in the computation of the alternative minimum tax in the first place—the very situation that is now before us. The statute as written requires that such credits be taken into account in the computation, for the statute requires that a comparison be made between the tentative alternative minimum tax as initially computed and the regular tax. And it is clear beyond any doubt that the "regular tax" is one that is arrived at after giving effect to the credits in question.

Furthermore, had Congress wished to tax only "preferences," as petitioners suggest, it might have legislated a formula which taxed a base consisting solely of tax preferences. Indeed, the original House version of the alternative minimum tax did just that. H. Rept. 95–1445, at 122–124 (1978), 1978–3 C.B. (Vol. 1) at 296–298. Congress, however, chose to provide for a tax measured by a broader base— alternative minimum taxable income—in which two specified preferences were merely included as potential components.

In short, the statements in the committee reports relied upon by petitioners must be considered in the light of the very nature of the provisions actually enacted and in recognition of the fact that such statements were made in a context that did not take into consideration the effect of tax credits. This is hardly the kind of clear and unambiguous expression of legislative purpose that would justify ignoring the plain and undisputed thrust of the language of a highly complicated statute. Petitioners' case, moreover, is even weaker, for the matter of whether the alternative minimum tax could apply in the absence of tax preferences was explicitly considered in the very next Congress, the 96th. In 1980, when Congress amended section 55 to allow credits (computed in a specified manner in relation to capital gains and adjusted itemized deductions) to be taken against the alternative minimum tax, it recognized that "a taxpayer may not currently be able to take full

advantage of otherwise allowable tax credits for the current year even though the taxpayer has few *or no* tax preferences." (Emphasis supplied.) S. Rept. 96–1039, at 25 (1980), 1980–2 C.B. 691, 701. However, it in no way indicated that such treatment was contrary to existing law and did not make the change retroactive to pre-1980 tax years. Pub. L. 96–603, sec. 4(c), 94 Stat. 3503, 3515 (1980), 1980–2 C.B. 684, 690.

Moreover, probably of greater significance here, Congress *did not change, even prospectively, the method of computing* alternative minimum taxable income or the alternative minimum tax itself prior to the application of credits. It in no way restricted that computation, even prospectively, to situations where tax preferences were an indispensable component in determining the amount of alternative minimum taxable income. Rather, the relief it provided was through the increased use of credits against the alternative minimum tax as thus computed to offset the effect of the absence of preferences or of only a small amount of such preferences. Thus, for the taxable year 1980 and thereafter, the taxpayer was given immediate relief in such situations; for the period prior to 1980, the taxpayers' relief was through the medium of a carryback or a carryover of his unused credits to other years.

The foregoing discussion makes it appropriate to consider at this point petitioners' contention that a decision in the Government's favor would deny them the benefit of the jobs credit, which Congress had enacted to further certain strong social and economic objectives. However, Congress was also faced in 1978 with a different and opposite objective ("tax equity") when it first enacted the alternative minimum tax, and it deliberately chose not to allow the jobs credit or any other nonrefundable credit (other than the foreign tax credit) to be taken against this new tax. See *supra* pp. 746–747. Moreover, even though Congress in 1980 decided to amend the law in this respect, the statute as it stood prior to that amendment fairly harmonized the conflicting objectives of the jobs credit and the alternative minimum tax. In the first place, petitioners did in fact get immediate substantial benefits of that credit, since their tax without any credits was $79,826, and their total tax liability, including the alternative minimum tax, as a consequence of the credits, was substantially reduced to $32,346.75 ($7,734 basic income tax plus $24,612.75

alternative minimum tax). And in the second place, the remaining unused portion of the jobs credit was available for carryback or carryover to other years. See *supra* pp. 746–747.

If we were to accept petitioners' contention that the presence of tax preferences is required, absurd consequences would follow. Suppose, for example, that petitioners had but $1 of capital gain tax preference, then even under their interpretation of the statute, there would be no basis whatever for refusing to make the computation called for by section 55, which admittedly produced an alternative minimum tax of $24,612.75. We can hardly attribute to Congress an intention to achieve the bizarre result that a $1 capital gain preference would generate an alternative minimum tax in excess of $24,000. The point is that Congress had no such intention, and there is no valid reason to refuse to apply the statute as written. And when the statute is thus applied, an entirely reasonable result follows. Petitioners' gross income was $192,490, and even after subtracting allowable deductions (adjusted for the zero bracket amount) and personal exemptions, there remained a taxable base of $184,787, which produced a tax of $79,826, prior to tax credits. Taking into account that one of the objectives of the alternative minimum tax was "tax equity," as we have previously indicated, the resulting total tax of $32,346.75 is hardly unreasonable, particularly when that portion of the unused credits was available for carryback or carryover.

(3) Petitioners make a final argument based upon section 58(h), I.R.C. 1954, which provides:

(h) REGULATIONS TO INCLUDE TAX BENEFIT RULE.—The Secretary shall prescribe regulations under which items of tax preference shall be properly adjusted where the tax treatment giving rise to such items will not result in the reduction of the taxpayer's tax under this subtitle for any taxable years.

The precise thrust of petitioners' position is obscure. Both petitioners and respondent rely upon the words of section 58(h) authorizing or directing the Secretary of the Treasury to promulgate regulations, and both point out that no such regulations have in fact been issued. We have held, however, that the Secretary's failure to promulgate regulations does not deprive section 58(h) of substantive operative effect. *Occidental Petroleum Corp. v. Commissioner*, 82 T.C. 819, 829 (1984).

We therefore consider whether section 58(h) in any way supports petitioners' position.

It is to be noted at the outset that section 58(h) was added to the Code in 1976, at a time when there was no alternative minimum tax, and it was geared to the then-existing minimum tax. See *Occidental Petroleum Corp. v. Commissioner*, 82 T.C. at 823. The alternative minimum tax was enacted 2 years later, and there would appear to be at least substantial doubt whether section 58(h) was ever intended to be applicable to this new tax.[9] However, we need not pass upon the point, because, even assuming that section 58(h) is generally applicable, it is not applicable in this case.

At best, section 58(h) would be relevant here only if there were tax preferences that entered into the computation of the alternative minimum tax and would require an appropriate adjustment to the extent that such preferences did not result in a tax benefit or could not result in a tax benefit in another year. But there were no preferences in this case that played any role in the calculation of the alternative minimum tax, and there is therefore no basis whatever for invoking the

---

[9]See H. Rept. 95–1445, at 123–124 (1978), 1978–3 C.B. (Vol. 1) at 297–298:

"In addition, for alternative minimum tax purposes, there is no prerequisite that capital gains actually produce a tax benefit for the taxpayer. Thus, unlike the situation with respect to the present minimum tax (sec. 58(h)), there is to be no adjustment of net capital gains subject to the alternative minimum tax where the tax treatment accorded to the gains does not result in a reduction of the taxpayer's tax. * * * The committee believes that these special rules are unnecessary in view of their complexity and of the relatively low rate of the alternative minimum tax."

See also "The Revenue Act of 1978," prepared for the Senate Finance Committee by the Staff of the Joint Comm. on Taxation, 95th Cong., 2d Sess. 48 (1978).

"After submission of the case, petitioners have called our attention to a release (captioned 'Notes to Tax Practitioners' ) of the District Director of Internal Revenue for the Jacksonville, Florida, District, which in a few cryptic sentences indicates indirectly that section 58(h) may be applicable to the alternative minimum tax. Petitioners also rely upon an unpublished 'Technical Advice Memorandum' dealing with a specific unusual situation, quite unlike the one before us, in which a computation under section 58(h) was treated as relevant in respect of the alternative minimum tax. See also Rev. Rul. 80–226, 1980–2 C.B. 26. Neither that 'Technical Advice Memorandum' which by its specific language, relying upon section 6110(j) (3), I.R.C. 1954, cautioned that it 'may not be used or cited as precedent' , nor the informal release of the District Director at Jacksonville has any binding or persuasive force here. Cf. *Pollack v. Commissioner*, 392 F. 2d 409, 411 (5th Cir. 1968), affg. 47 T.C. 92 (1966); *Adler v. Commissioner*, 330 F. 2d 91, 93 (9th Cir. 1964); *CWT Farms, Inc. v. Commissioner*, 79 T.C. 1054, 1069 (1982); *Green v. Commissioner*, 59 T.C. 456, 458 (1972)."

provisions of section 58(h). The point is completely lacking in merit.

*Decision will be entered for the respondent.*