JOSEPH A. AND MAXINE H. BAICKER, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9323-87.          Filed September 6, 1989.

*Robert S. Rothenberg* and *Alan J. Hofheimer,* for the petitioners.

*Susan T. Becker,* for the respondent.

OPINION

RAUM, *Judge:* The Commissioner determined a $1,591.30 deficiency in petitioners' 1983 income tax. Petitioners, husband and wife, filed a joint return as well as two successive amended joint returns. The deficiency resulted in part from the disallowance of an investment tax credit (ITC) claimed by petitioners in their first amended return, and they now seek a determination of an overpayment of $10,639. After certain concessions, the only issue remaining in dispute relates to the investment tax credit which in turn is based upon the investment tax credit claimed by a subchapter S corporation (PGT Geophysics, Inc.), in which the husband owned two-thirds of the stock. The husband will be referred to sometimes hereinafter as "petitioner." The case was submitted on the basis of a stipulation of facts. Petitioners resided in New Jersey when they filed their petition in this case.

Prior to July 19, 1983, petitioner owned 17.5 percent and a person named Alden Sayers owned 16.2 percent of the stock of Princeton Gamma-Tech, Inc. (PGT), a New Jersey corporation. Since 1965, PGT has been actively engaged in the business of the commercial development of x-ray and gamma-ray detectors and analytical instruments for research and industrial use. Petitioner and Sayers provided technical expertise for PGT. The remaining shareholders provided capital only and had no interest in the scientific and marketing "know-how" required in the business.

The Geophysics Division of PGT used logging trucks for on-site analysis and provided the gamma-ray spectroscope tool used in logging uranium ore. Although the stipulation of the parties is worded somewhat differently, there does not appear to be any dispute that pursuant to a plan of reorganization adopted July 13, 1983, the assets of the Geophysics Division were in fact transferred by PGT on July 29, 1983, to a newly organized Delaware corporation, PGT Geophysics, Inc. (Geophysics), in a tax-free reorganization under sections 361(a) and 368(a)(1)(D).[1] PGT received in exchange all of the transferee's 3,000 shares of original issue of its common stock, which PGT thereupon transferred to petitioner and Sayers—2,000 to petitioner and 1,000 to Sayers—in exchange for some of the stock of each of them in PGT. After their surrender of shares of PGT stock in the exchange, petitioner and Sayers continued to own 9.8 percent and 11.6 percent of the stock of PGT, respectively. Geophysics made a subchapter S election on the same day, July 29, 1983.

Using only the assets transferred to Geophysics by PGT and only the personnel who had previously been employed by the Geophysics Division of PGT, the operations of Geophysics consisted solely of the operations which had previously been conducted by the Geophysics Division of PGT and were carried on in every respect in exactly the same manner as when they were conducted in the Geophysics Division of PGT.

The assets transferred to Geophysics consisted of five trucks and related equipment attached to the trucks, probes, related computer equipment, and a small quantity of office furniture and fixtures. For years prior to its taxable year beginning March 1, 1983, and ending February 29, 1984, PGT had taken investment tax credits on its returns for such prior years in respect of the assets transferred to Geophysics. Because of the early termination of its use of those assets as a result of the July 29, 1983, reorganization, PGT "recaptured" a portion of those prior investment tax credits on its return for the year ending

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for 1983, the tax year in issue. All section references to regulations are to the Income Tax Regulations.

February 29, 1984, as it was required to do by section 47(a)(1). As a result of such recapture, PGT paid income taxes in the amount of $63,900.

In an amended return for 1983, Geophysics claimed an investment tax credit of $64,045, which included the $63,900 recaptured by PGT. The parties have stipulated that petitioner, as a subchapter S shareholder, "claimed his pro rata share of the investment credit claimed by Geophysics in the amount of $42,397 on his 1983 amended federal income tax return,"[2] and that "Petitioners claimed a refund of $10,639 due to the investment tax credit on their first amended Federal income tax return." Only that portion of the credit needed to offset petitioners' 1983 income tax liability and to support the claimed $10,639 overpayment is actually at stake here. At issue is whether Geophysics became entitled to the $63,900 investment tax credit which its predecessor, PGT, recaptured in respect of the assets transferred to Geophysics. We hold that Geophysics was not entitled to the investment tax credit.

The arguments of the parties in their opening briefs are like ships passing in the night. The Government contends that the acquisition itself of the assets in question by Geophysics does not entitle it to an investment tax credit. Petitioners do not dispute that contention, if such acquisition is considered in isolation, without taking into account the fact that Geophysics is the transferee of PGT in a tax-free section 368(a)(1)(D) reorganization. In essence, petitioners argue instead that Geophysics' right to the $63,900 ITC recaptured by PGT rests, not upon the *mere acquisition* of the assets from PGT, but upon the consequence of the status of Geophysics as a successor to the ITC rights of PGT in a tax-free type D reorganization.

In the interest of considering the problem in its proper context, we think it appropriate to first examine the Government's initial position, at least summarily, and then proceed to deal with petitioners' position. We note preliminarily that the statutory provisions involved in the positions of both sides are highly complex. The statute presents

---

[2]This amount does not appear to correlate with either of the investment tax credit amounts of $64,045 and $63,900 stipulated by the parties. Petitioner's two-thirds interest of each of those amounts is not equal to the $42,397 which the parties stipulated was claimed by petitioner as his pro rata share. The discrepancy is unexplained.

what appears to be an endless chain of confusing cross-references, some of them backtracking to earlier provisions and then continuing forward seemingly ad infinitum. Cf. *Estate of Rosenberg v. Commissioner*, 86 T.C. 980, 984, 986-987, 990, particularly n. 5 (1986), affd. without published opinion 812 F.2d 1401 (4th Cir. 1987). To find one's way through this statutory labyrinth one needs a thread at least as long as the one in the clew that Ariadne gave to Theseus. However, we are spared the necessity of struggling through all of the pertinent statutory provisions by reason of certain agreements between the parties. Nevertheless, enough remain to boggle the mind.

1. *Whether the acquisition of assets by Geophysics from PGT gave rise to any investment tax credit.* Section 38[3] authorizes a tax credit for investment in certain depreciable property. Section 46(a) provides rules governing qualification for, and the amount of, the credit. The amount of this credit is limited to a percentage of a taxpayer's "qualified investment" in "section 38 property." Sec. 46(a)(2)(A)(i).[4] "Qualified investment" is defined in section 46(c)(1) as follows:

SEC. 46(c). QUALIFIED INVESTMENT.—

(1) IN GENERAL.—For purposes of this subpart, the term "qualified investment" means, with respect to any taxable year, the aggregate of—

(A) the applicable percentage of the basis of each *new* section 38 property (as defined in section 48(b)) placed in service by the taxpayer during such taxable year, plus

(B) the applicable percentage of the cost of each *used* section 38 property (as defined in section 38(c)(1)) placed in service by the taxpayer during such taxable year. [Emphasis supplied.]

Section 48 defines section 38 property. In the instant case, the parties have stipulated that the transferred assets qualify as section 38 property. Although the parties disagree over whether the assets are *"new"* section 38

---

[3] In 1983, sec. 38 provided, in relevant part:

SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY.

(a) GENERAL RULE.—There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part.

(b) REGULATIONS.—The Secretary shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B.

[4] This section was redesignated as sec. 46(a)(1) by sec. 474(o)(1), Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 494, 834.

property, they do agree that those assets were not *"used"* section 38 property.

It may seem strange that property may be neither "used" nor "new," but these terms are words of art that are limited by very precise and restrictive statutory language. Thus, "used section 38 property" is defined in section 48(c)(1) to mean property acquired by "purchase," a word that is defined in section 48(c)(3)(A) to have the same meaning as that assigned to it by section 179(d)(2), which in turn requires inter alia that the basis of the property is not determined by reference to "the adjusted basis of such property in the hands of the person from whom acquired [PGT in this case]." And since there is no question that the assets here involved did retain PGT's basis upon transfer to Geophysics, as required by section 362(b), they were not "used" property as defined in the Code. Now, back to the meaning of "new section 38 property" which is defined in section 48(b) as follows:

SEC. 48(b). NEW SECTION 38 PROPERTY.—For purposes of this subpart, the term "new section 38 property" means section 38 property—

(1) the construction, reconstruction, or erection of which is completed by the taxpayer after December 31, 1961, or

(2) acquired after December 31, 1961, if the original use of such property commences with the taxpayer and commences after such date. * * *

Concededly, section 48(b)(1) is not applicable here. But petitioners argue that the assets qualify as "new" section 38 property pursuant to section 48(b)(2). Section 48(b)(2) contains three requirements all of which must be met for property to qualify as "new" section 38 property. First, the property must be "acquired after December 31, 1961." Second, "the original use of such property [must commence] * * * with the taxpayer," and third, the "original use" must commence after December 31, 1961.

Petitioner argues and the Government does not dispute that the "acquisition occurred upon completion of the split-off transaction [reorganization] in 1983." Thus, the first requirement of section 48(b)(2) has been met. And there is no dispute that the third requirement was satisfied. However, the second requirement has not been met. The property acquired in 1983 by Geophysics had been used by

PGT prior to the transfer. The regulations define "original use" as follows:

Sec. 1.48-2. New section 38 property.
(a) * * *
(b) Special rules for determining date of acquisition, original use, and basis attributable to construction, reconstruction, or erection. For purposes of paragraph (a) of this section, the principles set forth in paragraph (a)(1) and (2) of section 1.167(c)-1 shall be applied. Thus, for example, the following rules are applicable:

*    *    *    *    *    *    *

(7) The term "original use" means the *first use* to which the property is put, *whether or not* such use corresponds to the use of such property *by the taxpayer.* * * * [Emphasis added.]

Petitioners stipulated that PGT used the assets prior to the transfer of the assets to Geophysics and that Geophysics continued to use those assets thereafter. Clearly, PGT and not Geophysics was the taxpayer that put the assets to their "first use." Thus, the second requirement of section 48(b)(2) was not met. Accordingly, we hold that the property was not "new" when acquired by Geophysics, and, since it also was not "used," it could not serve as the basis for a "qualified investment." Geophysics is therefore not entitled to an investment tax credit by reason of its acquisition of the assets from PGT.

2. *Whether Geophysics as the successor to PGT in respect of the assets acquired from PGT became entitled to the investment tax credit as a corporate attribute of PGT carried over to Geophysics in a tax-free divisive reorganization under section 368(a)(1)(D).* Petitioners contend in substance that the investment tax credit rights of PGT constituted an item or corporate attribute of PGT that was carried over to Geophysics in the tax-free divisive section 368(a)(1)(D) reorganization. However, it has not been made clear to us just what investment tax credit would be carried over or just how such carryover could be explained.

PGT became entitled to the credits relating to the transferred assets and actually took advantage of those credits in full in the years that it acquired them—years that were prior to the year of the transfer to Geophysics. Since PGT disposed of these depreciable assets prior to the end of their useful lives, the investment tax credit previously

taken had to be adjusted to reflect this early disposition, Rev. Rul. 74-101, 1974-1 C.B. 7. Accordingly, upon transferring the assets, PGT was required to and in fact did "recapture" that portion of the credits allocable to the remaining period of their useful lives following the transfer. Sec. 47(a)(1). The amount of that recapture was $63,900. What then was carried over? Certainly not the credits themselves already taken by PGT in the years that it originally acquired the assets; PGT had already taken those credits and no part of *those* credits remained to be carried over. However, petitioners have stated the issue in terms of "whether the ITC *recaptured* by PGT is treated as a corporate attribute carried over to Geophysics." (Emphasis supplied.) But just how a "recapture" of the credits by PGT could be carried over is mystifying.

A recapture would not seem to be a meaningful corporate attribute of PGT to which Geophysics could succeed. It is difficult to imagine the recapture becoming a corporate attribute in the hands of the successor corporation. Perhaps petitioners have meant to incorporate in this concept other arguments made by them in respect of whether the assets should be classified as "new section 38 property." Thus, they have argued that the assets should be treated as "new," not because the "original use" actually began with Geophysics, but because the "original use" began with PGT resulting in the assets being classified as "new" in the hands of PGT. From this unassailable position petitioners have leaped to the highly questionable conclusion that "new" and "original use" were ITC corporate attributes of PGT to which Geophysics succeeded in the tax-free section 368(a)(1)(D) divisive corporate reorganization. Our attempt to reduce petitioners' analysis to a clearly understandable legal issue has been frustrating.

Nevertheless, since both parties in this case address the question as to the right of Geophysics to succeed to an investment tax credit of PGT, we consider the positions they have taken. Such positions involve two separate lines of inquiry: first, whether the specific provisions of section 381 setting forth the items or tax attributes that may be passed on to the transferee corporation are applicable here; and second, whether, in the absence of any such specific

provision, the transferee in any event may succeed to the rights of its predecessor upon the basis of some non-statutory principle permitting such carryover in a tax-free reorganization where the transferee continues to conduct the same business with the same transferred assets. We discuss each of these points separately.

(a) *Section 381.* Section 381(a) sets forth the general rule that "the acquiring corporation shall succeed to and take into account * * * the items described in subsection (c) of the * * * transferor corporation." Such carryover is subject not only to conditions and limitations stated in subsection (a) itself, but also those specified in subsections (b) and (c). As in effect for the year 1983, section 381(c) listed 27 separate items, each in a paragraph describing the respective item and generally stating some conditions or limitations affecting that item. Only paragraph section 381(c)(23) (now section 381(c)(25)) relates to investment tax credits.[5] As a result of the conditions and limitations in 381(a) and (b), there are at least two fatal impediments to the carryover of any investment tax credit rights here under section 381(a). We analyze each of them briefly.

(i) Section 381(b)(1) states as a condition for the carryover authorized by section 381(a) that, except in the case of a type F reorganization, "The taxable year of the distributor or transferor corporation shall end on the date of the distribution or transfer." The date of the transfer in this case was July 29, 1983. But PGT's "taxable year," a fiscal year, did not end until February 29, 1984. It was in its return for that fiscal year that PGT "recaptured" the $63,900 investment tax credit here under consideration. Thus, there can be no carryover under section 381, since the taxable year of PGT did not end on the date of transfer as required by section 381(b)(1).

(ii) Section 381(a)(2) itself by its very terms makes clear that it does not authorize the carryover.[6] It explicitly deals

---

[5]Sec. 381(c)(23) provides:

(23) CREDIT UNDER SECTION 38 FOR INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY.—The acquiring corporation shall take into account (to the extent proper to carry out the purposes of this section and section 38, and under such regulations as may be prescribed by the Secretary) the items required to be taken into account for purposes of section 38 in respect of the distributor or transferor corporation.

[6]Sec. 381(a)(2) provides:

with transfers in which there was nonrecognition of gain or loss to the corporation pursuant to section 361 in connection with a type D reorganization defined in section 368(a)(1), as was the case here. And it restricts the carryover in the case of type D reorganizations to those where "the requirements of subparagraphs (A) and (B) of section 354(b)(1) are met." But section 354(b)(1)(A) sets forth as a condition that: "(A) the corporation to which the assets are transferred acquires *substantially all* of the assets of the transferor of such assets." (Emphasis supplied.) Here, Geophysics, the acquiring corporation, did not acquire "substantially all of the assets" of PGT. It received only the assets used in the Geophysics Division of PGT. Consequently, for this reason alone, there can be no carryover under section 381.

It is thus abundantly clear that section 381 does not authorize Geophysics to succeed to any rights to any investment tax credits of PGT. But, as is plainly and painfully evident, section 381 is formulated in highly complex terms with its many conditions and limitations both within section 381 itself and in other provisions of the Code brought into play by cross-references. There would therefore be a strong basis for concluding that at least as it relates to the investment tax credit, unless superseded by other provisions of law in a particular instance, section 381 was intended to provide the exclusive authority for a carryover. In any event, we should be slow to depart from "a complex set of statutory provisions marked by a high degree of specificity," *Huntsberry v. Commissioner*, 83 T.C. 742, 748 (1984), even though we may think that Congress might have been favorably disposed to extend the benefits

---

SEC. 381(a). GENERAL RULE.—In the case of the acquisition of assets of a corporation by another corporation—

\* \* \* \* \* \* \*

(2) in a transfer to which section 361 (relating to nonrecognition of gain or loss to corporations) applies, but only if the transfer is in connection with a reorganization described in subparagraph (A), (C), (D), (F), or (G) of section 368(a)(1),

the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c). For purposes of the preceding sentence, a reorganization shall be treated as meeting the requirements of subparagraph (D) or (G) of section 368(a)(1) *only if the requirements of subparagraphs (A) and (B) of section 354(b)(1) are met.* [Emphasis supplied.]

of the legislation to situations of this sort had it considered the matter. Cf. *Occidental Petroleum Corp. v. United States,* 231 Ct. Cl. 334, 338, 685 F.2d 1346, 1348 (1982). But for a regulation that appears to be the cornerstone of petitioners' position, we might well end this opinion at this point.

That regulation, section 1.381(a)-1(b)(3)(i), correctly states at the outset that "Section 381 does not apply to * * * divisive reorganizations." However, after one intervening sentence, the regulation goes on to state that:

In a case where section 381 does not apply to a transaction, item, or tax attribute by reason of either of the preceding sentences, no inference is to be drawn from the provisions of section 381 as to whether any item or tax attribute shall be taken into account by the successor corporation.

Petitioners seize upon this last sentence as the basis for their position that the right to the carryover does not depend upon section 381 (the inapplicability of which they do not dispute), but rather is founded upon some general nonstatutory principle relating to tax-free reorganizations where the transferee corporation carries on the same business with the same assets previously conducted by the transferor. Petitioners have posed the issue in various terms. They acknowledge that they "must look outside Section 381 for an answer." We now consider that ultimate contention. They argue vaguely in their reply brief that we should not ignore "the overarching policy inherent in the reorganization and ITC provisions of the Code," and that "The real inquiry here is, rather, what result is required by the more general principles of the tax law where there is no specific authority defining original use in the context of a divisive reorganization?" We now consider that ultimate contention made by petitioners.

(b) *Whether there is an applicable nonstatutory principle requiring the carryover of the investment tax credit.* Geophysics acquired its assets in a divisive reorganization under section 368(a)(1)(D), and for that reason as well as one other, as we have already held, *supra,* section 381 does not authorize the carryover of any investment tax credit from PGT. That result is summarized in the first sentence of section 1.381(a)-1(b)(3)(i) of the regulations. And the third sentence of that regulation states that where section 381

does not apply to a "transaction, item, or tax attribute" by reason of either the first or second sentence, *"no inference is to be drawn from the provisions of section 381* as to whether any item or tax attribute shall be taken into account by the successor corporation." (Emphasis supplied.)

In the first place, this third sentence is formulated in the negative. It merely states that *no inference* shall be drawn from section 381 as to whether any item or tax attribute may be carried over. In the second place, it does not affirmatively provide for any carryover.

If there is to be a carryover, it must still be authorized by some provision of law. The regulation in this respect merely reflects the substance of the thought that appeared in the report of the Senate Finance Committee accompanying the bill that became the Internal Revenue Code of 1954. When originally enacted, the 1954 Code contained a complete revision and expansion of the statutory provisions with respect to corporate reorganizations and related transactions as well as the consequences flowing therefrom. Section 381(a) provided for carryovers and section 381(c) set forth the items that could be carried over in connection with such transactions. When the 1954 Code was enacted there were 19 such items in contrast to the 27 items in the Code in 1983, the year now before us. The Senate Committee report, S. Rept. 1622, 83d Cong., 2d Sess. (1954), stated (at 277):

The section is not intended to affect the carryover treatment of an item or tax attribute not specified in the section or the carryover treatment of items or tax attributes in corporate transactions not described in subsection (a). No inference is to be drawn from the enactment of this section whether any item or tax attribute may be utilized by a successor or a predecessor corporation *under existing law.* [Emphasis supplied.]

See also H. Rept. 1337, 41, 83d Cong., 2d Sess. (1954).

Obviously, all that was meant in that committee report was that section 381 was not intended to render inoperative any other provision of law that might otherwise authorize or require the carryover of an item or attribute that was not dealt with in section 381. And the regulation does nothing more. It is not affirmative authority to open the floodgates wide to any carryover that is not clearly based upon some provision of law. But petitioners do not point to

any provision of the Code to support their position here, nor have we been able to find any. Petitioners rely rather upon an alleged general principle that the carryover is justified where the successor in a divisive reorganization continues to carry on the same business previously conducted by the transferor corporation. In our judgment, any such general principle not founded upon clear specific statutory authority applicable to this case is insufficient to carry the day on their behalf. Nevertheless, we will examine the leading case upon which they rely in support of their position.

That case is *Libson Shops, Inc. v. Koehler,* 353 U.S. 382 (1957). It arose under the 1939 Code and was concerned with a corporation into which 16 separately incorporated businesses had been merged, each of which had previously filed separate income tax returns. Three of the merged corporations had pre-merger net operating losses and continued to operate at a loss after the merger. The surviving corporation sought to carry over and deduct those pre-merger net operating losses from the post-merger income realized in the conduct of the businesses of some of the other merged corporations. The case involved the meaning of the word "taxpayer" in applicable provisions of the 1939 Code, and the Supreme Court resolved the controversy against the surviving corporation.

The Court analyzed the carryback and carryforward provisions relating to net operating losses. It found that Congress was "primarily concerned with the fluctuating income of a single business," and that there was no indication in the legislative history that the provisions "were designed to permit the averaging of the pre-merger losses of one business with the post-merger income of some other business." The Court concluded that the corporation which succeeded to the businesses of the three loss corporations was not "entitled to a carryover since the income against which the offset is claimed was not produced by substantially the same businesses which incurred the losses."

Although the statutory provisions of the 1939 Code involved in *Libson Shops* have been superseded by new provisions in the 1954 Code, petitioners argue that the basic theory underlying that case persists, namely, that the

Court's adoption of a "continuity of business enterprises" test continues to have vitality. We have no occasion here to agree or disagree with that analysis. But it has no application to this case. *Libson Shops* involved a claimed carryover of net operating losses. The Supreme Court held that they could not be carried over to be taken against income of different businesses. That decision hardly establishes the converse in this case, namely, that it decides *affirmatively* that where there is continuity of the same business there is general unspecified authority after a tax-free divisive reorganization for the carryover of an investment tax credit under the 1954 Code. In any event, even though it may possibly be regarded as establishing some sort of general principle that precludes carryovers of deductions in the absence of continuity of business operations, it is hardly a provision of "law" that *affirmatively* requires the carryover sought here by petitioners. Certainly, the negative provision of the third sentence of section 1.381(a)-1(b)(3)(i) of the regulations relied upon by petitioners hardly supports any such result as that claimed by petitioners.

Petitioners rely further upon some revenue rulings which, in their view, support their position. None of them involve investment tax credits. Petitioners themselves indicate that, upon being superseded by specific statutory provisions, the rulings were withdrawn prospectively, but petitioners argue that the underlying principles of the rulings continue to be valid. We regard these rulings to be too remote from the issue before us, and in any event at most of questionable authority here.

Finally, we are aware that only a portion of petitioner's share of the investment tax credit claimed to have been carried over from PGT to Geophysics was required to offset all of petitioners' 1983 taxes, and that petitioners sought to use the excess by the way of carrybacks against their 1980 and 1981 taxes in amended returns for those years. And we are also aware that the parties have stipulated, over respondent's objections as to relevance, that petitioners thereafter received refunds in specified amounts in respect of those years. However, those years are not before us, and we do not pass upon the correctness of such refunds or

regard them as precedent in this case involving 1983 where we have thoroughly explored the issues.

We hold that petitioners are not entitled to take the claimed investment tax credit directly because the property, in the hands of Geophysics, failed to qualify as either "new" or "used" section 38 property. The investment tax credit is also not available indirectly through a carryover from PGT pursuant to section 381 or any other provision of law. Section 381 itself does not authorize the carryover. And petitioners have not shown, nor can we find, any other controlling provision of the law which would justify the carryover of the claimed investment tax credit. In our judgment, petitioners have failed to carry their burden and are accordingly not entitled to the husband's share of any of the credit claimed by Geophysics in respect of the investment tax credit "recaptured" by PGT.

*Decision will be entered under Rule 155.*