133 T.C. No. 11


UNITED STATES TAX COURT


DEERE & COMPANY AND CONSOLIDATED SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20320-06.                    Filed October 22, 2009.


        For each of the taxable years ended Oct. 31, 1997
through 2001, the total income that P, a consolidated
group of corporations, reported in its consolidated
return included amounts from the operations during each
of those taxable years that the parent of P (Parent)
conducted through its foreign branches (Parent's for-
eign branch operations).  In calculating the consoli-
dated tax shown in the consolidated return for the
taxable year at issue ended Oct. 31, 2001, P claimed a
credit for increasing research activities under sec.
41, I.R.C.  In calculating that credit, P elected the
alternative incremental research credit prescribed by
sec. 41(c)(4), I.R.C.  In determining that alternative
credit for the taxable year at issue, P calculated
under sec. 41(c)(1)(B), I.R.C., its average annual
gross receipts for the 4 taxable years preceding that
taxable year by using the total income that it reported
in its consolidated return for each of those 4 years
reduced by the amounts included therein for each of
those years from Parent's foreign branch operations.

Held: In determining the alternative research credit under sec. 41(c)(4), I.R.C., and thus the credit to which P is entitled under sec. 41(a), I.R.C., P is required to include in the calculation under sec. 41(c)(1)(B), I.R.C., of its average annual gross receipts for the 4 taxable years preceding the taxable year at issue the amounts for each of those years from Parent's foreign branch operations.

Laurence M. Bambino, Michael B. Shulman, Richard John Gagnon, Jr., and Douglas R. McFadyen, for petitioner.

Reid Michael Huey, for respondent.

## OPINION

CHIECHI, Judge: This case is before us on the motion for summary judgment of respondent (respondent's motion) and the motion for summary judgment of Deere & Co. and Consolidated Subsidiaries (petitioner's motion).[1] We shall grant respondent's motion, and we shall deny petitioner's motion.

## Background

At the time of the filing of the petition, petitioner maintained its principal office in Illinois.

At all relevant times, petitioner manufactured, distributed, and financed a full line of agricultural equipment, a variety of commercial and consumer equipment, and a broad range of equipment

---

[1]We shall refer to the consolidated group of Deere & Co. and Consolidated Subsidiaries as petitioner.

for construction and forestry and other products and provided various services to a worldwide market.

During each of petitioner's taxable years ended October 31, 1997 through 2001, petitioner's operations were organized and reported in the following four major business segments: (1) Agricultural equipment (petitioner's agricultural equipment division), (2) commercial and consumer equipment (petitioner's commercial and consumer equipment division), (3) construction and forestry, and (4) credit. During each of those taxable years, petitioner received income from operations conducted, inter alia, through branches in Germany, Italy, and Switzerland that Deere & Co. (Deere), the parent corporation of petitioner, owned. (We shall sometimes refer to the operations conducted through Deere's branches in Germany, Italy, and Switzerland as Deere's foreign branch operations.)

Deere commenced Deere's foreign branch operations in Germany (Deere's German branch operations) in 1967. At all relevant times, Deere's German branch operations, which were the largest of Deere's foreign branch operations, were primarily part of petitioner's agricultural equipment division. Deere's German branch operations included the following factories or offices that Deere operated: (1) A tractor factory in Mannheim, Germany, (2) a combine factory in Zweibruken, Germany, (3) a cab factory and a parts depot in Bruchsal, Germany, and (4) a German domestic

sales office and a European general office in Mannheim, Germany. Deere's German branch operations also included the following entities: (1) John Deere Intl. GmbH (JDIG) and (2) Maschinenfabrik Kemper GmbH & Co. KG (Kemper).

At all relevant times, JDIG, a corporation that Deere incorporated in 1998 in Germany and wholly owned, had offices in Mannheim, Germany. JDIG operated initially as a marketing organization for export sales outside of Germany and thereafter as an office for administrative, billing, and central services for the European operations of Deere.

Deere filed Form 8832, Entity Classification Election (Form 8832), in which it elected to treat JDIG, effective as of October 14, 1998, as a "foreign eligible entity with a single owner to be disregarded as a[n] * * * entity" separate from Deere. Respondent approved that election. (We shall sometimes refer to a foreign eligible entity with a single owner that is to be disregarded as a separate entity as a disregarded entity.) Since October 14, 1998, Deere and petitioner have (1) treated the activities of the disregarded entity JDIG as a foreign branch of Deere and (2) reported in the consolidated tax return, Form 1120, U.S. Corporation Income Tax Return, that petitioner filed for each taxable year (petitioner's consolidated return) any income and expenses of JDIG as Deere's income and expenses.

At all relevant times, Kemper, a limited partnership formed in 1997 in Germany,[2] manufactured attachments for various farm equipment at a factory and offices in Stadtlohn, Germany.  At those times, Deere was a limited partner of Kemper and, as such, owned directly more than 99 percent of Kemper.  Maschinenfabrik Kemper-Verwaltungs and Beteiligungs GmbH (MKVB), a subsidiary of Deere organized in Germany that Deere wholly owned directly, was the general partner of Kemper.

At all relevant times, Deere and petitioner have treated (1) Kemper as a foreign branch and (2) MKVB as if it were a disregarded entity.  Thus, petitioner has reported in petitioner's consolidated return any respective income and expenses of Kemper and MKVB as Deere's income and expenses.  (We shall sometimes refer to all of Deere's German branch operations, including the operations of JDIG, Kemper, and MKVB, as Deere's German branch.)

During petitioner's taxable year ended October 31, 2001, the year at issue, Deere's German branch, excluding the respective operations of JDIG and Kemper,[3] (1) had approximately 4,500 employees, of whom approximately 1,500 were salaried employees,

---

[2]Kemper was formed after Deere acquired a company in 1996 that was subsequently reorganized into Kemper.

[3]JDIG and Kemper were very small operations within Deere's German branch when measured by gross receipts and other income items.

and (2) incurred approximately $237 million of wage, salary, and benefit expenses.

During each of petitioner's taxable years ended October 31, 1997 through 2001, the operations within Deere's German branch maintained separate books and records. During each of those taxable years, those German branch operations, other than the respective operations of JDIG and Kemper, comprised one or more permanent establishments as provided in article 5 of the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital and to Certain Other Taxes, U.S.-F.R.G., Aug. 29, 1989, S. Treaty Doc. No. 101-10 (1991) (U.S.-German Treaty). (We shall refer to a permanent establishment as provided in article 5 of the U.S.-German Treaty as a U.S.-German Treaty permanent establishment.)[4]

At all relevant times, Deere's foreign branch operations in Italy and Switzerland were significantly smaller than Deere's

---

[4]The parties stipulated that during each of the taxable years ended Oct. 31, 1997 through 2001, the operations within Deere's German branch, other than the respective operations of JDIG and Kemper, constituted one or more U.S.-German Treaty permanent establishments. The parties were unable to agree as to whether during each of those years Deere's respective foreign branch operations in Italy and Switzerland (discussed below) constituted one or more permanent establishments under the respective U.S. treaties with those countries. The parties agree that that factual dispute is not material to our deciding the issue presented in the parties' respective motions for summary judgment. The parties further agree that if we were to conclude, which we do not, that that factual dispute is material to our deciding that issue, we should deny those motions and hold a trial to resolve that dispute.

German branch. Deere's foreign branch operations in Italy, which Deere began in 1977, were part of Deere's agricultural equipment division. Those operations consisted largely of a marketing and sales office in Milan, Italy, that Deere operated for the sales of agricultural equipment primarily in Italy. (We shall some-times refer to all of Deere's operations in Italy as Deere's Italian branch.)

Deere's foreign branch operations in Switzerland consisted of (1) a small branch office in Schaffhausen, Switzerland, and (2) John Deere Intl. GmbH (JDIS). Deere established the small branch office in 2000 and has operated it as part of petitioner's commercial and consumer equipment division. Deere established JDIS, a limited liability company that Deere organized in 2000 in Switzerland and wholly owned, in order to serve as the successor to JDIG in conducting the export sales and marketing operations for petitioner's agricultural equipment division outside Germany.

Deere filed Form 8832 in which it elected to treat JDIS, effective as of June 22, 2000, as a disregarded entity (i.e., an entity to be disregarded as an entity separate from Deere). Respondent approved that election. Since June 22, 2000, Deere and petitioner have (1) treated the activities of the disregarded entity JDIS as a foreign branch of Deere and (2) reported in petitioner's consolidated return any income and expenses of JDIS as Deere's income and expenses. (We shall sometimes refer to all

of Deere's operations in Switzerland, including the operations of JDIS, as Deere's Swiss branch.)

During petitioner's taxable year ended October 31, 2001, Deere paid or accrued foreign income taxes of approximately $29 million with respect to its foreign branch operations in Germany, Italy, and Switzerland, a substantial portion of which was paid or accrued on account of German income taxes.

Petitioner timely filed petitioner's consolidated return for the taxable year ended October 31, 2001.[5] (We shall refer to petitioner's consolidated return for the taxable year ended October 31, 2001, as the 10/31/01 return.) In that return, petitioner reported on page 1, line 1, the following:

| Line | Description | Amount |
|------|-------------|--------|
| 1a | Gross receipts or sales | $12,713,272,933 |
| 1b | Less returns and allowances | 1,223,782,471 |
| 1c | Balance (i.e., gross receipts or sales less returns and allowances, or net gross receipts) | 11,489,490,462 |

In the 10/31/01 return, petitioner also reported on page 1, lines 2 and 3, the following:

| Line | Description | Amount |
|------|-------------|--------|
| 2 | Cost of goods sold (from Schedule A, Cost of goods sold, line 8) | $9,308,674,331 |
| 3 | Gross profit (i.e., net gross receipts from line 1c minus cost of goods sold from line 2) | 2,180,816,131 |

---

[5]The corporations that made up petitioner were at all relevant times accrual basis taxpayers.

In the 10/31/01 return, petitioner also reported on page 1, lines 4 through 10, the following:

| Line | Description | Amount |
|------|-------------|--------|
| 4 | Dividends (from Schedule C, Dividends and Special Deductions) | $290,961,385 |
| 5 | Interest | 935,023,701 |
| 6 | Gross rents | 398,492,890 |
| 7 | Gross royalties | 36,902,274 |
| 8 | Capital gain net income (from Schedule D, Capital Gains and Losses) | 0 |
| 9 | Net gain or (loss) (from Form 4797, Sales of Business Property, part II, line 18) | 41,008,550 |
| 10 | Other income | 810,670,466 |

In the 10/31/01 return, petitioner reported on page 1, line 11, as total income the total (i.e., $4,693,875,397) of the amounts listed above that it reported on page 1, lines 3 through 10, of that return. That total and those amounts included the amounts, if any, from the operations during the taxable year ended October 31, 2001, that Deere conducted through Deere's German branch, Deere's Italian branch, and Deere's Swiss branch.[6]

---

[6]For each of the taxable years ended Oct. 31, 1997 through 2000, the total income that petitioner reported on page 1, line 11, of petitioner's consolidated return, which was the total of the amounts that petitioner reported on page 1, lines 3 through 10, of each of those returns, included the amounts, if any, from the operations during each of those taxable years that Deere conducted through Deere's German branch, Deere's Italian branch, and Deere's Swiss branch.

Except with respect to the computation of the credit for increasing research activities under section 41,[7] in calculating the consolidated tax shown in the 10/31/01 return, petitioner included all of the income and all of the expenses from Deere's operations through Deere's German branch, Deere's Italian branch, and Deere's Swiss branch.[8]

In calculating the consolidated tax shown in the 10/31/01 return, petitioner claimed as a foreign tax credit a substantial portion of the $29 million of foreign income taxes that Deere paid or accrued with respect to those foreign branch operations.

In calculating the consolidated tax shown in the 10/31/01 return, petitioner also claimed a credit of $5,978,898 under section 41. In calculating that credit, petitioner elected the alternative incremental research credit prescribed by section 41(c)(4).

In determining the alternative incremental research credit for the taxable year ended October 31, 2001, petitioner calculated under section 41(c)(1)(B) its average annual gross receipts

---

[7]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year at issue.

[8]Except with respect to the computation of the credit under sec. 41, for each of the taxable years ended on or before Oct. 31, 2001, during which Deere conducted operations through Deere's German branch, Deere's Italian branch, and/or Deere's Swiss branch, petitioner included all of the income and all of the expenses from any such operations in calculating the consolidated tax reported in petitioner's consolidated return for each such year.

for the 4-year period preceding that year to be $11,737,809,783. Petitioner calculated that amount of average annual gross receipts by averaging the following total annual gross receipts for each of those years:

| Taxable Year Ended Oct. 31 | Total Annual Gross Receipts |
|---|---|
| 1997 | $11,458,680,882 |
| 1998 | 11,871,525,477 |
| 1999 | 11,176,314,267 |
| 2000 | 12,444,718,504 |

In determining the total annual gross receipts listed above for each of the 4 taxable years preceding the taxable year ended October 31, 2001, and the average annual gross receipts for those 4 years, petitioner (1) used the total income that it reported on page 1, line 11, of petitioner's consolidated return for each of those years[9] and (2) reduced that total income for each of those years by the following total of (a) gross receipts less returns and allowances and (b) other income items for each of those years from the operations that Deere conducted though Deere's German branch, Deere's Swiss branch, and Deere's Italian branch (total annual gross receipts of Deere's foreign branches):

---

[9]The total income that petitioner reported on page 1, line 11, of petitioner's consolidated return for each of the 4 taxable years preceding the taxable year ended Oct. 31, 2001, was equal to the total of the amounts that it reported on page 1, lines 3 through 10, of each of those returns.

|                             | Total Annual Gross Receipts |
| Taxable Year Ended Oct. 31  | of Deere's Foreign Branches |
|-----------------------------|-----------------------------|
| 1997                        | $2,165,774,284              |
| 1998                        | 2,265,017,943               |
| 1999                        | 2,289,516,068               |
| 2000                        | 2,530,653,492               |

Respondent issued a notice of deficiency to petitioner for the taxable year ended October 31, 2001 (notice).[10]  In that notice, respondent disallowed the credit under section 41 that petitioner claimed in the 10/31/01 return.  That was because respondent determined that in calculating that credit petitioner had erroneously excluded from the computation of its average annual gross receipts for the 4 taxable years preceding the taxable year ended October 31, 2001, the following total annual gross receipts of Deere's foreign branches:

|                             | Total Annual Gross Receipts |
| Taxable Year Ended Oct. 31  | of Deere's Foreign Branches |
|-----------------------------|-----------------------------|
| 1997                        | $2,165,774,284              |
| 1998                        | 2,265,017,943               |
| 1999                        | 2,289,516,068               |
| 2000                        | 2,530,653,492               |

In the notice, respondent determined that petitioner's average annual gross receipts for the 4 taxable years preceding the taxable year ended October 31, 2001, was $13,373,420,885,[11]

---

[10]The notice also pertained to other taxable years that are not at issue here.

[11]Respondent calculated the average annual gross receipts for the 4-year period preceding the taxable year ended Oct. 31, 2001, by averaging the following total annual gross receipts of

(continued...)

and not the $11,737,809,783 that petitioner reported in the
10/31/01 return.

Discussion

We must decide whether petitioner is required to include in
the calculation under section 41(c)(1)(B) of its average annual
gross receipts for the 4 taxable years preceding the taxable year
ended October 31, 2001, the total annual gross receipts of
Deere's foreign branches for each of those 4 preceding taxable
years.[12]  Before considering that issue of first impression, we
shall set forth some background that will be helpful in under-

---

[11](...continued)
petitioner, which included total annual gross receipts of Deere's
foreign branches:

| Taxable Year Ended Oct. 31 | Total Annual Gross Receipts |
|---|---|
| 1997 | $12,906,688,685 |
| 1998 | 13,492,890,472 |
| 1999 | 12,747,793,061 |
| 2000 | 14,346,311,323 |

Respondent's computation of the total annual gross receipts
listed above for each of the 4 years preceding the taxable year
ended Oct. 31, 2001, and the average annual gross receipts for
those 4 years not only included total annual gross receipts of
Deere's foreign branches for each of the taxable years ended Oct.
31, 1997 through 2000, but also reflected certain other adjust-
ments that respondent made in the notice and that are not in
dispute.

[12]Petitioner is required to calculate under sec. 41(c)(1)(B)
its average annual gross receipts for the 4 taxable years preced-
ing the taxable year ended Oct. 31, 2001, in order to compute the
alternative incremental research credit under sec. 41(c)(4) and
thus the credit under sec. 41(a)(1) to which it is entitled for
the taxable year at issue ended Oct. 31, 2001.

standing the parties' respective arguments and in deciding that issue.

As pertinent here, section 38(a)(2) allows as a credit against the taxes imposed for a taxable year by subtitle A (relating to income taxes), chapter 1, of the Code (chapter 1) the amount of the current year business credit.[13]  Section 38(b) defines the term "the amount of the current year business credit" as the sum of certain credits listed in that section, including the research credit (credit for increasing research activities) determined under section 41(a).  See sec. 38(b)(4).

Congress first allowed a credit for increasing research activities in 1981 when it enacted section 44F into the Code. Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 221(a), 95 Stat. 241.  In allowing that credit, Congress provided "incentives for greater private activity in research" in order to "stimulate a higher rate of capital formation and to increase productivity".  H. Rept. 97-201, at 111 (1981), 1981-2 C.B. 352, 358; S. Rept. 97-144, at 77 (1981), 1981-2 C.B. 412, 439.  The credit for increasing research activities that Congress enacted as section 44F was redesignated by Congress in 1984 as section 30 of the Code, Deficit Reduction Act of 1984, Pub. L. 98-369, sec.

---

[13]As pertinent here and as discussed infra note 39, a credit under sec. 38(a)(2) is not allowed against all of the taxes imposed by chapter 1.  See, e.g., sec. 1.882-1(d), Income Tax Regs.

471(c), 98 Stat. 826, 831-832, and was reenacted and redesignated by Congress in 1986 as section 41 of the Code, Tax Reform Act of 1986, Pub. L. 99-514, sec. 231(d)(2), 100 Stat. 2173-2180. In connection with the latter reenactment, Congress indicated that the "purpose of enacting the credit [in 1981] was to encourage business firms to perform the research necessary to increase the innovative qualities and efficiency of the U.S. economy." H. Rept. 99-426, at 177 (1985), 1986-3 C.B. (Vol. 2) 1, 177; S. Rept. 99-313, at 694 (1986), 1986-3 C.B. (Vol. 3) 1, 694.

When Congress first enacted the credit for increasing research activities in 1981 as section 44F, the calculation of the credit was based on expenditures with respect to qualified research. Specifically, then section 44F(a) allowed as a credit for the taxable year an amount equal to 25 percent of the excess, if any, of the qualified research expenses for the taxable year over the base period research expenses. Then section 44F(b) defined the term "qualified research expenses" to mean the sum of certain amounts with respect to qualified research as defined in then section 44F(d) that were described in then section 44F(b) and that were paid or incurred by the taxpayer during the taxable year in carrying on any trade or business of the taxpayer. For this purpose, qualified research did not include research conducted outside the United States. See then sec. 44F(d)(1). In limiting the expenditures with respect to research on which the

credit under then section 44F was to be computed to expenditures with respect to certain research in the United States, Congress indicated that

> expenditures for research which is conducted outside the United States do not enter into the credit computation, whether or not the taxpayer is located or does business in the United States; the test is whether the laboratory experiments, etc., actually take place in this country.

H. Rept. 97-201, supra at 116, 1981-2 C.B. at 361.

When Congress first enacted the credit for increasing research activities in 1981 as section 44F, Congress intended to prevent artificial increases in research expenditures, in particular through the shifting of expenditures in the case of intracompany transactions among a controlled group of corporations or otherwise related persons, including partnerships, proprietorships, and any other trades or businesses, whether or not incorporated, that were under common control of the taxpayer. Specifically, Congress provided special rules in then section 44F(f) to ensure that the credit was allowed only where there were actual increases in qualified research expenditures for the taxable year.[14]  See id. at 123-124, 1981-2 C.B. at 364-365; S.

---

[14]Then sec. 44F(f)(1) created a so-called aggregation-of-expenditures rule (aggregation rule).  Pursuant to that rule, in determining the amount of the credit under then sec. 44F, (1)(a) all members of the same controlled group of corporations within the meaning of then sec. 44F(f)(5) were to be treated as a single taxpayer and (b) under regulations prescribed by the Secretary of the Treasury (Secretary), all trades or businesses,

(continued...)

Rept. 97-144, supra at 83-84, 1981-2 C.B. at 442-443.

When Congress reenacted and redesignated the credit for increasing research activities in 1986 as section 41, it retained, inter alia, the approach of (1) calculating the credit on the basis of expenditures with respect to qualified research, see then sec. 41(a)(1),[15] (2) excluding from qualified research research conducted outside the United States, i.e., foreign research, see then sec. 41(d)(4)(F), and (3) ensuring that the credit was allowed only where there were actual increases in qualified research expenditures, in particular in the case of intracompany transactions among a controlled group of corporations or otherwise related persons, including partnerships, proprietorships, and any other trades or businesses, whether or

---

[14](...continued)
whether or not incorporated, under common control within the meaning of then sec. 44F(f)(1)(B) were to be treated as a single taxpayer, and (2) the credit, if any, allowable by then sec. 44F to each such member and to each such person was to be its proportionate share, if any, of the qualified research expenses giving rise to the credit.

[15]Specifically, when Congress reenacted and redesignated the credit for increasing research activities in 1986 as sec. 41, then sec. 41(a)(1) included in the computation of that credit for a taxable year 20 percent of the excess, if any, of (1) the qualified research expenses for the taxable year over (2) the base period research expenses. At that time, Congress also allowed for the first time in then sec. 41(a)(2) 20 percent of the basic research payments determined under sec. 41(e)(1)(A) to be included in the computation of the credit. Petitioner does not claim any credit under sec. 41 calculated by reference to basic research payments determined under sec. 41(e)(1)(A). See sec. 41(a)(2).

not incorporated, that were under common control of the taxpayer, see then sec. 41(f).

In 1989, Congress made a change to the computation of the credit for increasing research activities under section 41 that is material to the issue in the parties' respective motions for summary judgment.[16] See Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7110(b), 103 Stat. 2323-2324. Specifically, in 1989 Congress decided to base the calculation of that credit on not only expenditures with respect to qualified research but also gross receipts.[17] Congress gave the following explanation for that decision:

> In extending the research credit, the committee wished to respond to the criticism that the incentive effect of the present-law research credit was diminished as a result of the method of computing the taxpayer's base amount. Critics have noted that although an increase in research expenditures resulted in a taxpayer receiving a larger credit for that year, it also resulted in higher base period amounts (and therefore smaller credits) in the following three years. As a consequence, the present-law credit's marginal incentive effect provided in the first year was largely offset in the following three years. The committee, therefore, modified the method of calculating a tax-

[16]Other changes that Congress made to sec. 41 in 1989 are not material to the issue that we must decide.

[17]In 1989, Congress did not change then sec. 41(a)(2) that Congress had enacted into the Code in 1986 and that allowed for the first time 20 percent of the basic research payments determined under then sec. 41(e)(1)(A) to be included in the computation of the credit for increasing research activities. See supra note 15. Nor did Congress change in 1989 the definition of foreign research in then sec. 41(d)(4)(F) or the aggregation rule in then sec. 41(f).

payer's base amount in order to enhance the credit's incentive effect. The committee did wish, however, to retain an incremental credit structure in order to maximize the credit's efficiency by not allowing (to the extent possible) credits for research that would have been undertaken in any event.

Although the committee believes it is important to readjust the base amount annually in a way which does not undercut the incentive effect of the credit (which occurs when a firm's base is adjusted solely by reference to its own prior levels of research spending), the committee also determined it was appropriate that the base adjustments reflect firm-specific factors. By adjusting each taxpayer's base to its own experience, the committee wanted to make the credit widely available at the lowest possible revenue cost.

Because businesses often determine their research budgets as a fixed percentage of gross receipts, it is appropriate to index each taxpayer's base amount to average growth in its gross receipts. By so adjusting each taxpayer's base amount, the committee believes the credit will be better able to achieve its intended purpose of rewarding taxpayers for research expenses in excess of amounts which would have been expended in any case. Using gross receipts as an index, firms in fast-growing sectors will not be unduly rewarded if their research intensity, as measured by their ratio of qualified research to gross receipts, does not correspondingly increase. Likewise, firms in sectors with slower growth will still be able to earn credits as long as they maintain research expenditures commensurate with their own sales growth.

Adjusting a taxpayer's base by reference to its gross receipts also has the advantage of effectively indexing the credit for inflation and preventing taxpayers from being rewarded for increases in research spending that are attributable solely to inflation.

H. Rept. 101-247, at 1199-1200 (1989).[18]

_____

[18]There was no provision relating to the credit under sec. 41 in the bill that the U.S. Senate passed. See H.R. 3299, 101st Cong. (as passed by Senate, Oct. 13, 1989); see also H. Conf.

(continued...)

As changed by Congress in 1989 and as in effect for the year at issue, section 41(a) provides that for purposes of section 38 the research credit determined under section 41 for the taxable year is an amount equal to the sum of (1) 20 percent of the excess, if any, of (a) the taxpayer's qualified research expenses for the taxable year over (b) the base amount and (2) 20 percent of the taxpayer's basic research payments determined under section 41(e)(1)(A).[19]

As enacted by Congress in 1989 and as in effect for the year at issue, section 41(c)(1) defines the term "base amount" to mean the product of (1) the fixed-base percentage[20] and (2) the average annual gross receipts of the taxpayer for the 4 taxable years preceding the taxable year for which the credit is being determined (credit year).[21]

---

[18](...continued)
Rept. 101-386, at 543 (1989).

[19]See supra note 15.

[20]Sec. 41(c)(3)(A) defines the term "fixed-base percentage" to mean generally the percentage that the aggregate qualified research expenses of the taxpayer for taxable years beginning after Dec. 31, 1983, and before Jan. 1, 1989, is of the aggregate gross receipts of the taxpayer for those taxable years. Sec. 41(c)(3)(C) provides that in no event is the fixed-base percentage to exceed 16 percent.

[21]Sec. 41(c)(2) provides that in no event is the base amount to be less than 50 percent of the qualified research expenses for the credit year.

When Congress decided in 1989 to base the computation of the credit for increasing research activities on not only expenditures with respect to qualified research but also gross receipts, Congress enacted section 41(c)(5) into the Code.[22]  Then section 41(c)(5) provided:

> (5) Gross receipts.--For purposes of this subsection [(c) of section 41 relating to base amount], gross receipts for any taxable year shall be reduced by returns and allowances made during the taxable year. In the case of a foreign corporation, there shall be taken into account only gross receipts which are effectively connected with the conduct of a trade or business within the United States.

In changing in 1989 the computation of the credit for increasing research activities, Congress generally followed, with certain modifications, the provision relating to that credit in the bill of the U.S. House of Representatives (House bill provision).[23]  See H. Conf. Rept. 101-386, at 543 (1989) (Conference Report).  In describing the House bill provision, the Conference

---

[22]In 1989, Congress also enacted sec. 41(c)(4), entitled "Consistent treatment of expenses required", into the Code. Specifically, then sec. 41(c)(4)(A) required that qualified research expenses be taken into account in computing the fixed-base percentage on a basis consistent with the determination of qualified research expenses for the credit year.  Then sec. 41(c)(4)(B) authorized the Secretary to prescribe regulations in order to prevent distortions in the calculation of the taxpayer's qualified research expenses or gross receipts caused by a change in accounting methods that the taxpayer used between the current year and a year taken into account in computing the taxpayer's fixed-base percentage.  In 1996, Congress redesignated then sec. 41(c)(4) as sec. 41(c)(5).  See infra note 25.

[23]See supra note 18.

Report stated, inter alia:  "the [House] bill provides that a foreign affiliate's gross receipts which are not effectively connected with the conduct of a trade or business in the United States do not enter into the computation of the credit."  Id. at 542.[24]

In 1996, Congress enacted new section 41(c)(4) into the Code, effective for taxable years that began after June 30, 1996.[25]  Small Business Job Protection Act of 1996, Pub. L. 104-188, sec. 1204(c), (f)(2), 110 Stat. 1774, 1775.  That section allows a taxpayer to elect an alternative method of computing the credit under section 41 and establishes a three-tiered formula for making that alternative computation.  Petitioner made the election under section 41(c)(4) for the taxable year at issue ended October 31, 2001.[26]

As in effect for the year at issue, section 41(c)(4) provides that the credit for increasing research activities deter-

---

[24]The report of the U.S. House of Representatives contained language relating to its proposed change in 1989 to the computation of the credit under sec. 41 that is identical to the language in the Conference Report quoted in the text.  See H. Rept. 101-247, at 1202-1203 (1989).

[25]When Congress enacted new sec. 41(c)(4) into the Code in 1996, it redesignated then sec. 41(c)(4), entitled "Consistent treatment of expenses required", and then sec. 41(c)(5), entitled "Gross receipts", as sec. 41(c)(5) and (6), respectively.

[26]Pursuant to sec. 41(c)(4)(B), petitioner's election applies to the taxable year at issue and all succeeding taxable years unless revoked with the consent of the Secretary.

mined under section 41(a)(1) is equal to the sum of (1) 2.65 percent of so much of the qualifying research expenses for the taxable year as exceeds 1 percent of the average described in section 41(c)(1)(B) (i.e., the average annual gross receipts of the taxpayer for the 4 taxable years preceding the credit year) but does not exceed 1.5 percent of that average, (2) 3.2 percent of so much of those expenses as exceeds 1.5 percent of that average but does not exceed 2 percent of that average, and (3) 3.75 percent of so much of those expenses as exceeds 2 percent of that average. See sec. 41(c)(4)(A).

In 1999, Congress changed the definition of foreign research in section 41(d)(4)(F) to read: "Any research conducted outside the United States, the Commonwealth of Puerto Rico, or any possession of the United States." Congress thereby expanded the definition of qualified research in section 41(d) to include certain research conducted in not only the United States but also the Commonwealth of Puerto Rico and any possession of the United States. See Ticket to Work and Work Incentives Improvement Act of 1999 (1999 Act), Pub. L. 106-170, sec. 502(c)(1), 113 Stat. 1919.

When Congress expanded in 1999 the definition of qualified research in section 41(d) to include certain research conducted in not only the United States but also the Commonwealth of Puerto Rico and any possession of the United States, Congress added the

following phrase at the end of section 41(c)(6), entitled "Gross receipts": "the Commonwealth of Puerto Rico, or any possession of the United States".[27] See 1999 Act sec. 502(c)(1). Section 41(c)(6) as amended in 1999 and as in effect for the year at issue provides:

> (6) Gross receipts.--For purposes of this subsection [(c) of section 41 relating to base amount], gross receipts for any taxable year shall be reduced by returns and allowances made during the taxable year. In the case of a foreign corporation, there shall be taken into account only gross receipts which are effectively connected with the conduct of a trade or business within the United States, the Commonwealth of Puerto Rico, or any possession of the United States.

The foregoing background gives context to the respective positions and arguments of the parties on the sole issue that we must decide. Before considering those positions and arguments, we note that our review of the filings that the parties made with respect to their respective motions for summary judgment raised certain questions that we gave the parties an opportunity to address at a hearing (Court's hearing).[28] After that hearing,

---

[27]The changes that Congress made in 1999 to sec. 41(d)(4)(F) and (c)(6) were generally effective with respect to amounts paid or incurred after June 30, 1999. See Ticket to Work and Work Incentives Improvement Act of 1999, Pub. L. 106-170, sec. 502(c)(3), 113 Stat. 1920.

[28]Before the Court's hearing, respondent filed respondent's motion and a memorandum of law in support of that motion. Petitioner then filed petitioner's motion and a memorandum of law in support of that motion and in opposition to respondent's motion. Thereafter, respondent filed a memorandum of law in opposition to petitioner's motion. Petitioner then filed a reply

(continued...)

petitioner filed a motion for leave to file a supplemental memorandum of law.  We granted that motion and allowed petitioner to file a supplemental memorandum of law (petitioner's supplemental memorandum).  We also allowed respondent to file a supplemental memorandum of law (respondent's supplemental memorandum).

We consider now the respective positions and arguments of the parties on the issue presented.  It is petitioner's position that, in calculating the alternative incremental credit under section 41(c)(4) (alternative section 41 credit), petitioner is not required to include in the computation of the average described in section 41(c)(1)(B) (i.e., its average annual gross receipts for the 4 taxable years preceding the taxable year ended October 31, 2001) the total annual gross receipts of Deere's foreign branches for each of those 4 preceding taxable years.  It is respondent's position that petitioner is required to do so.

Petitioner maintains in petitioner's filings and petitioner's supplemental memorandum, and respondent no longer disputes, that section 41 does not provide a definition of the

[28](...continued)
to respondent's memorandum in opposition to petitioner's motion. We shall refer to the filings that petitioner made and the filings that respondent made before the Court's hearing took place as petitioner's filings and respondent's filings, respectively.

term "gross receipts" used in section 41(c).[29] Petitioner further maintains in petitioner's filings and petitioner's supplemental memorandum, and respondent continues to dispute, that we should interpret the term "gross receipts" in section 41(c)(1)(B)[30] to exclude the total annual gross receipts of Deere's foreign branches. According to petitioner, "the structure of the statute" and its legislative history "demonstrate * * * that Congress did not intend to include such receipts."[31]

_____

[29]In respondent's filings, respondent argued that sec. 41 "provides an expansive definition of the activities or sources of income to be included" in gross receipts under sec. 41(c) and that there are "Only two stated exceptions to the definition of gross receipts [that] are identified in section 41(c)(6)". In respondent's supplemental memorandum, respondent states: "Respondent agrees that the scope of gross receipts * * * is not entirely clear and unambiguous."

[30]As discussed previously, sec. 41(c)(1)(B) states: "the average annual gross receipts of the taxpayer for the 4 taxable years preceding the taxable year for which the credit is being determined". It is necessary for petitioner to calculate under sec. 41(c)(1)(B) that average in order to compute under sec. 41(c)(4) the alternative section 41 credit. See supra note 12.

[31]Petitioner advanced its arguments about "the structure of the statute" and Congress's intent in enacting that statute in petitioner's filings. Petitioner reaffirms those arguments in petitioner's supplemental memorandum, albeit in somewhat different language than petitioner used in petitioner's filings. Respondent maintains, and petitioner disputes, that in petitioner's supplemental memorandum petitioner modified an argument advanced in petitioner's filings and thus advances a new argument that it did not advance in petitioner's filings. According to petitioner,

> Petitioner does not take the position that amounts should be excluded from gross receipts for purposes of section 41 merely because they are foreign source

(continued...)

We turn first to petitioner's argument that "the structure of the statute demonstrates that Congress did not intend [petitioner] to include" the total annual gross receipts of Deere's foreign branches in calculating under section 41(c)(1)(B) petitioner's average annual gross receipts for the 4 taxable years preceding the taxable year at issue.  In support of that argument, petitioner asserts:

> Because section 41 does not provide a comprehensive definition of "gross receipts," no negative implication should be drawn from the absence of a similar express exclusion in the case of an unincorporated foreign branch [as appears in the second sentence of section 41(c)(6) in the case of a foreign corporation]. Rather, because the R&E credit is calculated for all commonly controlled corporations and unincorporated trades or businesses under section 41(f), it follows that foreign gross receipts from a foreign trade or business such as a foreign branch operation should be

_____

31(...continued)
within the meaning of sections 861-865 (or, conversely, included in gross receipts merely because they are U.S. source). * * * While Petitioner concedes that the point was not adequately addressed in * * * [petitioner's filings], and that Petitioner's counsel who spoke at the [Court's] Hearing at times erroneously represented Petitioner's position, Petitioner does not believe that its position in this regard constitutes a change or modification from that set forth in Petitioner's * * * [filings].  Throughout its filings, Petitioner made clear that the amounts it was seeking to exclude from gross receipts were, first and foremost, only those related to its foreign branches. * * *

We need not resolve the parties' disagreement over whether petitioner advances a new argument in petitioner's supplemental memorandum.  We address herein the arguments that are the linchpins of petitioner's position on the issue presented.

excluded just as the [second sentence of] section 41(c)(6) expressly does for a foreign corporation.[32]

We reject petitioner's argument that the structure of section 41, in particular (1) the second sentence of section 41(c)(6) and (2) section 41(f), shows that Congress did not intend to require it to include in the calculation under section 41(c)(1)(B) the total annual gross receipts of Deere's foreign branches. When Congress first enacted the credit for increasing research activities in 1981 as section 44F, Congress intended to prevent artificial increases in research expenditures, in particular through the shifting of expenditures in the case of intracompany transactions among a controlled group of corporations or otherwise related persons, including partnerships, proprietorships, and any other trades or businesses, whether or not incorporated, that were under common control of the taxpayer. To do so, Congress provided the aggregation rule in then section 44F(f) to ensure that the credit was allowed only where there were actual increases in qualified research expenditures for the taxable year. See H. Rept. 97-201, supra at 123-124, 1981-2 C.B. at 364-365; S. Rept. 97-144, supra at 83-84, 1981-2 C.B. at 442-443. In 1981 when Congress enacted the credit for increasing

---

[32]As pertinent here, the second sentence of sec. 41(c)(6) states: "In the case of a foreign corporation, there shall be taken into account only gross receipts which are effectively connected with the conduct of a trade or business within the United States". See infra note 38.

research activities as section 44F and in 1989 when it changed the basis of calculating that credit and retained the aggregation rule in section 41(f),[33] Congress was familiar with the concepts of "controlled group of corporations" and "all trades or businesses (whether or not incorporated) which are under common control". See then sec. 44F(f)(1); sec. 41(f)(1). As pertinent here, Congress provided in then section 44F(f)(1)(B) and section 41(f)(1)(B) that, under regulations prescribed by the Secretary, in determining the amount of the credit under section 41, all trades or businesses, whether or not incorporated, which are under common control are to be treated as a single taxpayer, and the credit for increasing research activities, if any, allowable to each such person is to be its proportionate share of the qualified research expenses giving rise to the credit. Congress mandated in then section 44F(f)(1)(B) and section 41(f)(1)(B):

> The regulations prescribed under this subparagraph [(B) of then section 44F(f)(1) and (B) of section 41(f)(1) relating to all trades or businesses, whether or not incorporated, which are under common control] shall be based on principles similar to the principles which apply in the case of subparagraph (A) [of then section 44F(f)(1) and section 41(f)(1) relating to a controlled group of corporations].

In other words, Congress directed in then section 44F(f)(1)(B) and section 41(f)(1)(B) that principles similar to the principles in then section 44F(f)(1)(A) and section 41(f)(1)(A) which apply

---

[33]See _supra_ note 17.

in determining the amount of the credit for increasing research activities in the case of a controlled group of corporations are to apply in determining the amount of the credit in the case of all trades or businesses, whether or not incorporated, under common control.

When Congress wanted to apply to all trades or businesses, whether or not incorporated, under common control principles that are similar to the principles in then section 44F(f)(1)(A) and section 41(f)(1)(A) relating to a controlled group of corporations, Congress knew how to, and did, so mandate. If Congress had wanted to exclude from or include in the calculation under section 41(c)(1)(B) the gross receipts of all foreign unincorporated trades or businesses (e.g., Deere's foreign branches) on the basis of principles similar to the principles that Congress prescribed in the second sentence of section 41(c)(6) in the case of foreign corporations, it knew how to so mandate and would have so mandated. It did not. The silence of Congress is strident.

We turn next to petitioner's argument that the legislative history of section 41 demonstrates that Congress did not intend to include in the calculation under section 41(c)(1)(B) the total annual gross receipts of Deere's foreign branches. In support of that argument, petitioner asserts:

> Although [the second sentence of] section 41(c)(6)
> expressly refers only to "foreign corporations," the
> legislative history of * * * [the Omnibus Budget Recon-
> ciliation Act of 1989], in which Congress added the

gross receipts component to the R&E credit, describes this provision differently, stating: "[T]he bill provides that a foreign affiliate's gross receipts which are not effectively connected with the conduct of a trade or business in the United States do not enter into the computation of the credit." * * * The term "affiliate" has a broader meaning than the term "corporation." * * *

The likely explanation for the use of the broad term "affiliate," rather than "corporation," in the * * * [Omnibus Budget Reconciliation Act of 1989] legislative history is that the Budget Committee viewed the "taxpayer" under section 41(c) as being the controlled group of both foreign corporations and foreign unincorporated trades or businesses, consistent with section 41(f). As such, the Budget Committee used the broad term "affiliate" to encompass trades or businesses as well as corporations, both of which may constitute members of the controlled group--i.e., "the taxpayer" under the statute. [Fn. ref. omitted.[34]]

---

[34]In petitioner's supplemental memorandum, petitioner restates the argument in petitioner's filings that is discussed in the text. In petitioner's supplemental memorandum, petitioner argues:

Petitioner believes that there generally should be symmetry between the treatment of foreign and domestic taxpayers. This symmetry lies at the heart of Petitioner's position. Specifically, it is Petitioner's position that any receipt from a trade or business that would be expressly included in gross receipts by virtue of section 41(c)(6) if derived by a foreign corporation should similarly be included if derived by a foreign partnership, foreign sole proprietorship or foreign branch. Conversely, any receipt attributable to the activities of a foreign corporation that would not be included in gross receipts pursuant to section 41(c)(6) should not be required to be included in gross receipts where the activities are conducted by a foreign partnership, foreign sole proprietorship or foreign branch. Petitioner believes * * * that Congress intended this equality in treatment * * *.

We reject petitioner's argument that the legislative history of section 41 shows that Congress did not intend to include in the calculation under section 41(c)(1)(B) the total annual gross receipts of Deere's foreign branches. Petitioner's reliance on the legislative history of the second sentence of section 41(c)(6), which refers to a "foreign affiliate", is improper and misplaced. The second sentence of section 41(c)(6) is clear and unambiguous on its face and applies only in the case of a foreign corporation.[35] We generally may not resort to legislative history to give meaning to a clear and unambiguous statute. See, e.g., United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989); Montgomery v. Commissioner, 122 T.C. 1, 7 (2004). We may not resort here to the legislative history of the clear and unambiguous second sentence of section 41(c)(6) on which petitioner relies. That history does not support, let alone unequivocally support, petitioner's argument that Congress did not intend to include in the calculation under section 41(c)(1)(B) the total annual gross receipts of Deere's foreign branches. See, e.g., Huntsberry v. Commissioner, 83 T.C. 742, 747-748 (1984). Even though the legislative history on which petitioner relies used the term "foreign affiliate", that term is itself ambiguous, and Congress used the unambiguous term "foreign

---

[35]The second sentence of sec. 41(c)(6) begins: "In the case of a foreign corporation".

corporation" when it enacted the second sentence of section 41(c)(6). Furthermore, the concept "effectively connected with the conduct of a trade or business within the United States",[36] which Congress used in the second sentence of section 41(c)(6) "In the case of a foreign corporation", is a concept that Congress enacted into the Code and that applies to a foreign corporation (as well as to a nonresident alien individual). It is not a concept that the Code applies to a foreign "affiliate" that is not a foreign corporation. See secs. 882, 872. The clear and unambiguous language of the second sentence of section 41(c)(6) is controlling.

We turn now to another argument that petitioner advances in support of its position on the issue presented. Petitioner argues:

> Interpreting "gross receipts" under section 41(c) to exclude gross receipts from foreign branches such as those operated by Deere is consistent with the historical focus of the R&E credit on domestic activities * * * [which] did not change when the gross receipts components of the R&E credit were originally introduced as part of * * * [the Omnibus Budget Reconciliation Act of 1989]. * * *

In support of that argument, petitioner asserts:

> the R&E credit has been focused on activities within the United States since its original enactment in 1981. * * * Interpreting "gross receipts" to include only domestic gross receipts maintains that domestic focus. * * *

---

[36]See supra note 32.

\*      \*      \*      \*      \*      \*      \*

     \* \* \* In no way did Congress intend the gross receipts component of the base amount calculation to fundamentally alter the basic framework of the R&E credit by changing its historic domestic focus.

     Similarly, there is nothing about the addition of the \* \* \* [alternative incremental research credit under sec. 41(c)(4)] to the R&E credit that alters the domestic orientation of the statute. \* \* \* The legislative history [of the alternative incremental research credit] provides no explanation as to the purpose of \* \* \* [that credit], but there is no purpose apparent in that regime \* \* \* to expand the scope of the credit in general, and the calculation of gross receipts in particular, beyond the taxpayer's domestic activities. [Fn. ref. omitted.]

As we understand it, petitioner is arguing that the "historic domestic focus" of the credit for increasing research activities was on both the making of research expenditures in the United States and the conduct of a taxpayer's trade or business in the United States.  According to petitioner, its interpretation of the term "gross receipts" is consistent with the alleged "historic domestic focus" of the credit for increasing research activities on the conduct of a taxpayer's trade or business in the United States.[37]

---

[37]In petitioner's supplemental memorandum, petitioner argues:

    whether a particular receipt is required to be taken into account for purposes of section 41 should be determined primarily by whether or not the receipt has the requisite nexus with the United States. \* \* \* In the case of a domestic taxpayer, Petitioner believes that the essential consideration is whether or not the receipt in question forms part of the taxpayer's U.S.

(continued...)

We reject petitioner's argument regarding the alleged "historic domestic focus" of the credit involved here. In 1981 when Congress first enacted the credit for increasing research activities into the Code and thereafter when Congress reenacted that credit into the Code, it did so in order to provide "incentives for greater private activity in research", H. Rept. 97-201, supra at 111, 1981-2 C.B. at 358; S. Rept. 97-144, supra at 77, 1981-2 C.B. at 439, which would thereby "encourage business firms to perform the research necessary to increase the innovative qualities and efficiency of the U.S. economy", H. Rept. 99-426, supra at 177, 1986-3 C.B. (Vol. 2) at 177; S. Rept. 99-313, supra at 694, 1986-3 C.B. (Vol. 3) at 694. Throughout the history of the credit for increasing research activities, Congress excluded from research qualifying for the credit research conducted outside the United States. See then sec. 44F(d)(1); sec. 41(d)(4)(F). In doing so, Congress wanted to ensure that

> expenditures for research which is conducted outside the United States do not enter into the credit computation, whether or not the taxpayer is located or does business in the United States; the test is whether the laboratory experiments, etc., actually take place in this country.[38]

---

[37](...continued)
trade or business or is attributable to a trade or business being conducted outside of the United States. [Fn. ref. omitted.]

[38]In 1999, Congress expanded the definition of qualified research in sec. 41(d) to include certain research conducted in not only the United States but also the Commonwealth of Puerto

(continued...)

H. Rept. 97-201, supra at 116, 1981-2 C.B. at 361.

As made clear in the above-quoted legislative history of the credit for increasing research activities, the "historic domestic focus" of Congress in providing that credit was to promote expenditures for research conducted in the United States; it was not on "whether or not the taxpayer is located or does business in the United States". Id. We reject petitioner's assertion that in the case of a U.S. corporation "the essential consideration is whether or not the receipt in question forms part of the taxpayer's U.S. trade or business or is attributable to a trade or business being conducted outside the United States."

We conclude that neither the structure or the legislative history of section 41 nor the so-called historic domestic focus of the credit for increasing research activities establishes that Congress intended to exclude the total annual gross receipts of Deere's foreign branch operations from the computation under section 41(c)(1)(B) of petitioner's average annual gross receipts for the 4 taxable years preceding the taxable year at issue ended

---

[38](...continued)
Rico and any possession of the United States. See sec. 41(d)(4)(F). Petitioner does not claim that what it calls a "marginal expansion" in 1999 of the definition of qualified research is material to resolving the issue presented here. Nor does petitioner maintain that the following phrase that Congress added at the end of sec. 41(c)(6) in 1999 when Congress expanded the definition of qualified research is material to resolving the issue here: "the Commonwealth of Puerto Rico, or any possession of the United States."

October 31, 2001.[39]  During each of the taxable years ended
October 31, 1997 through 2000, the total income that petitioner
reported on page 1, line 11, of petitioner's consolidated return
included the amounts, if any, from the operations during each of
those years that Deere conducted through Deere's German branch,
Deere's Italian branch, and Deere's Swiss branch.  Petitioner has
failed to establish, and we have not found, any valid reason for
excluding those amounts from the calculation under section
41(c)(1)(B).

Petitioner's final argument in support of its position on
the issue presented is that "even if the gross receipts from
Deere's foreign branch operations were construed to be within the
literal meaning of 'gross receipts' under section 41(c) * * *,
the Court should interpret the statute to exclude such receipts."
In support of that argument, petitioner asserts:

> even if the term "gross receipts" under section
> 41(c)(4) could be read literally to include * * * gross
> receipts from Deere's foreign branch operations, this

---

[39]Neither sec. 41 nor its legislative history sheds any
light on why Congress decided in the case of a foreign corpora-
tion to include in gross receipts under sec. 41(c) "only gross
receipts which are effectively connected with the conduct of a
trade or business within the United States".  The reason that
Congress did so might simply have been that the credits permitted
by, inter alia, sec. 38, which includes the credit for increasing
research activities under sec. 41, are not allowed against the
flat tax of 30 percent imposed by sec. 881(a) and sec. 1.882-
1(b)(1), Income Tax Regs., on the income of a foreign corporation
which is not effectively connected with the conduct of a trade or
business within the United States.  See sec. 1.882-1(d), Income
Tax Regs.

- 38 -

Court should reject that reading to avoid a result
plainly at variance with the congressional intent
behind the R&E credit.

We reject for the reasons discussed above petitioner's

assertion that the inclusion of the total annual gross receipts

of Deere's foreign branches in the calculation under section

41(c)(1)(B) is "plainly at variance with the congressional intent

behind the R&E credit."

In further support of its argument that, even if we were to

hold that the "literal meaning" of the term "gross receipts" in

section 41(c)(1)(B) includes the total annual gross receipts of

Deere's foreign branches, we should nonetheless interpret that

section to exclude those receipts, petitioner asserts:

> it would be odd for the statute to be interpreted to
> effectively discriminate in favor of foreign corpora-
> tions and against United States corporations. * * *
> Because foreign corporations do not have to include
> their gross receipts (except for those that are not
> [sic] effectively connected with a United States trade
> or business) under section 41(c)(6), requiring Deere to
> include receipts from its foreign branch operations
> would have the relative effect of penalizing Deere, and
> benefitting its foreign competitors, without any appar-
> ent justification under the statute or legislative
> history.

We reject petitioner's assertions.  Petitioner has failed to

persuade us that requiring it to include the total annual gross

receipts of Deere's foreign branches in the calculation under

section 41(c)(1)(B) will have the discriminatory effect about

which petitioner complains.[40]  In any event, the second sentence of section 41(c)(6) on which petitioner relies to support its argument regarding the alleged discriminatory effect about which it complains is, as discussed above, clear and unambiguous and applies only in the case of a foreign corporation.  We have found nothing in section 41, its legislative history, or petitioner's arguments that permits us to conclude that in the case of a foreign unincorporated trade or business such as Deere's foreign branches we must apply principles similar to the principles in the second sentence of section 41(c)(6) that apply in the case of a foreign corporation.

We hold that petitioner is required to include in the calculation under section 41(c)(1)(B) of its average annual gross receipts for the 4 taxable years preceding the taxable year ended October 31, 2001, the total annual gross receipts of Deere's foreign branches for each of those 4 preceding taxable years.

---

[40]A U.S. corporation might complain that Congress discriminated against it by requiring it to include worldwide income in total income which, after any deductions allowed by the Code, is subject to tax under sec. 11, whereas a foreign corporation conducting business in the United States must include only income which is effectively connected with the conduct of a trade or business within the United States in total income which, after any deductions allowed by the Code, is subject to tax under sec. 11.  Nonetheless, Congress chose to do so for what it believed were good reasons.

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

<u>An order denying petitioner's motion and granting respondent's motion and decision for respondent will be entered</u>.