HEWLETT-PACKARD COMPANY AND CONSOLIDATED SUBSIDI-
ARIES, PETITIONER *v*. COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket Nos. 21976–07, 10075–08.    Filed September 24, 2012.

The parties cross-moved for partial summary judgment on
whether P was required, as asserted by R, to include nonsales
income, including dividends, interest, rent, and other income,
in its "average annual gross receipts" for purposes of calcu-
lating its I.R.C. sec. 41 research credits for taxable years 1999
through 2001. *Held*: P was required to include such amounts
in its "average annual gross receipts" in determining available
research credits for the taxable years at issue. Accordingly, we
will grant R's motion on this matter.

*Albert H. Turkus* and *Paul Oosterhuis*, for petitioner.
*David P. Fuller* and *Roger L. Kave*, for respondent.

OPINION

GOEKE, *Judge*: In two statutory notices of deficiency
respondent disallowed in part credits for increasing research

activities pursuant to section 41[1] claimed by petitioner, Hewlett-Packard Co. & Consolidated Subsidiaries (HP), for taxable years 1999 through 2003. Following concessions and stipulations, the parties cross-moved for partial summary judgment on two issues:

(1) whether HP was required to include intercompany gross receipts received from controlled foreign corporations (CFCs), within the meaning of section 41(f)(5), in its "average annual gross receipts" (AAGR) when calculating its section 41 credits for all of the taxable years in issue; and

(2) whether HP was required to include nonsales income, including dividends, interest, rent, and other income in its AAGR when calculating its section 41 credits for taxable years 1999 through 2001.

Concerning the first issue, respondent, in his response to HP's cross-motion, indicated that he had no objection to granting HP's motion to exclude such amounts in determining its AAGR. Accordingly, we will grant petitioner's motion, in part.

As to the second issue, we find that HP was required to include such nonsales income when determining its AAGR. Therefore, we will also grant respondent's motion, in part.

## *Background*

HP is a corporation organized under the laws of the State of Delaware. At all relevant times HP maintained its principal corporate offices in California.

During the taxable years at issue HP was a global technology and service company. HP, directly or through its foreign affiliates,[2] manufactured and distributed a broad range of technology-based business products including printers, scanners, ink and laser supplies, desktop personal computers, notebooks, workstations, high-end servers, total disk storage systems, and software technology, including system management software. For all relevant years HP accrued income from the sale of goods and services, dividends,

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Among HP's foreign affiliates were several CFCs within the meaning of sec. 951. These CFCs, pursuant to sec. 41(f)(5), were also members of HP's "controlled group of corporations".

interest, and gross royalties and other income from its CFCs and from unrelated parties.

For each of the taxable years in issue, HP claimed section 41(a)(1) credits for increasing research activities, electing to calculate such credits according to the alternative incremental credit (AIRC) computation method prescribed in section 41(c)(4). In determining its available credits under that section, HP was required, in part, to compute its AAGR for the four taxable years preceding the respective determination year. HP used the amounts reported on line 1(c) of its Forms 1120, U.S. Corporation Income Tax Return, as the base for its AAGR calculation for each year. Form 1120, for taxable years 1995 to 2000, described the amounts reported on line 1(a) as "gross receipt or sales" and the amounts reported on line 1(b) as "returns and allowances". Line 1(c) represented the difference between line 1(a) and line 1(b). HP included intercompany revenues from sales to its CFCs in line 1(a) for each of the relevant years. [3]

Form 1120, for taxable years 1995 to 2000, described amounts reported on lines 4, 5, 6, 7, and 10 as "Dividends", "Interest", "Gross rents", "Gross royalties", and "Other income", respectively. HP excluded amounts reported on those lines in computing its AAGR for purposes of determining its section 41(a)(1) credits for taxable years 1999 to 2001.

For each taxable year 1999 to 2002, pursuant to section 280C(c)(3), HP elected to reduce its section 41 credit by the amount equal to the maximum rate of tax under section 11(b)(1) multiplied by the section 41 credit, rather than reduce its section 174 expense deduction. For its 2003 tax year, HP did not make such an election.

Following respondent's issuance of two statutory notices of deficiency, HP timely petitioned this Court to contest respondent's determinations. After subsequent stipulations and concessions, the amounts attributable to HP's lines 1(c), 4, 5, 6, 7, and 10 for each of the relevant tax years are as follows:

---

[3] On June 12, 2003, HP filed amended returns for its 1999 and 2000 tax years to reduce the AAGR (included in line 1(c)) by gross receipts accrued from CFCs. The same day, HP filed a claim for refund with respect to its 2001 tax year to similarly reduce the AAGR (included on line 1(c)) by gross receipts accrued from CFCs.

| Taxable year | Line 1(c): Gross receipts or sales less returns and allowances | Line 4: Dividends | Line 5: Interest | Line 6: Gross rents | Line 7: Gross royalties | Line 10: Other income |
|---|---|---|---|---|---|---|
| 1995 | [1]$15,689,432 | -0- | $172,816 | $449,260 | $144,057 | $80,468 |
| 1996 | 17,905,779 | -0- | 276,553 | 527,781 | 243,233 | 49,625 |
| 1997 | 20,473,806 | $335 | 494,017 | 633,342 | 273,959 | 63,355 |
| 1998 | 16,586,875 | 281 | 679,076 | 702,422 | 242,411 | 84,527 |
| 1999 | 16,401,655 | 1,005 | 676,384 | 666,093 | 22,278 | 30,286 |
| 2000 | 19,080,696 | 2,391 | 289,519 | 598,480 | 144,266 | 36,144 |

[1]Each figure represents amounts in thousand-dollar increments.

## Discussion

### I. *Summary Judgment*

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials of phantom factual issues. *Boyd Gaming Corp. v. Commissioner*, 106 T.C. 343, 346–347 (1996); *Kroh v. Commissioner*, 98 T.C. 383, 390 (1992). Either party may move for summary judgment upon all or any part of the legal issues in controversy. Rule 121(a); *FPL Group, Inc., & Subs. v. Commissioner*, 116 T.C. 73, 74 (2001). We will render a decision on a motion for partial summary judgment "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, * * * show that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b); *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994).

The parties filed cross-motions for partial summary judgment, in part, on whether HP, for tax years ended October 31, 1999 through 2001, must include dividends, interest, rent, and other income accrued from unrelated parties in its calculation of AAGR for purposes of the AIRC computation method prescribed in section 41(c)(4). The parties agree, and we conclude, that there is no genuine issue of material fact and that a decision may be rendered as a matter of law.

### II. *The Credit for Increasing Research Activities*

Congress introduced the credit for increasing research activities in the Economic Recovery Tax Act of 1981, Pub. L. No. 97–34, sec. 221(a), 95 Stat. at 241. The credit was

intended to "stimulate a higher rate of capital formation and to increase productivity", S. Rept. No. 97–144, at 76–77 (1981), 1981–2 C.B. 412, 438–439; H.R. Rept. No. 97–201, at 111 (1981), 1981–2 C.B. 352, 358, and "to encourage business firms to perform the research necessary to increase the innovative qualities and efficiency of the U.S. economy", S. Rept. No. 99–313, at 694 (1986), 1986–3 C.B. (Vol. 3) 1, 694; H.R. Rept. No. 99–426, at 177 (1985), 1986–3 C.B. (Vol. 2) 1, 177. [4]

Before 1989 the research credit was calculated entirely on the basis of research expenditures. Both former section 44F(a) and its later iteration under section 30(a) prescribed an annual credit in an amount equal to 25% of the excess of "qualified research expenditures" (QRE) for the taxable year over "base period research expenses". The former provisions, in sections 44F(c) and 30(c), respectively, defined "base period research expenses" as the average of QRE for the three years preceding the taxable year at issue. When Congress reenacted and redesignated the credit in 1986 as section 41, then section 41(a)(1) retained the basic credit calculation *supra*; however, the credit amount was altered from 25% to 20% of the excess of QRE over "base period research expenses". [5]

In the Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101–239, sec. 7110(b), 103 Stat. at 2323, Congress substantially altered the scheme for calculating the research credit, effectively tying the credit computation to not only research expenditures, but also "gross receipts". As amended and in effect for the years in issue, section 41(a)(1) prescribes a credit for an amount equal to 20% of the excess of any QRE for the taxable year over the "base amount". A taxpayer's "base amount" is the product of its (1) "fixed-base percentage" and (2) its AAGR for the four taxable years preceding the taxable year at issue. Sec. 41(c)(1). Section 41(c)(3)(A) generally defines the "fixed-base percentage" as the percentage of aggregate QRE of the taxpayer for the taxable years begin-

[4] The credit was originally included in sec. 44F. In 1984 Congress redesignated sec. 44F as sec. 30. Deficit Reduction Act of 1984, Pub. L. No. 98–369, sec. 471(c), 98 Stat. at 826. The credit was subsequently reenacted and redesignated, again, by Congress in 1986 as sec. 41. Tax Reform Act of 1986, Pub. L. No. 99–514, sec. 231(d)(2), 100 Stat. at 2173.

[5] In that year Congress also allowed for the first time in then sec. 41(a)(2) a credit for 20% of the basic research payments determined under sec. 41(e)(1)(A).

ning after December 31, 1983, and before January 1, 1989, to AAGR of the taxpayer for the same taxable years.[6]

Congress also promulgated then section 41(c)(5), providing that "gross receipts", for purposes of the section 41 research credit, "shall be reduced by returns and allowances made during the taxable year. In the case of a foreign corporation, there shall be taken into account only gross receipts which are effectively connected with the conduct of a trade or business within the United States".[7]

In describing its reasoning for these changes, Congress noted:

[T]he committee wished to respond to the criticism that the incentive effect of the present-law research credit was diminished as a result of the method of computing the taxpayer's base amount. Critics have noted that although an increase in research expenditures resulted in a taxpayer receiving a larger credit for that year, it also resulted in higher base period amounts (and therefore smaller credits) in the following three years. As a consequence, the present-law credit's marginal incentive effect provided in the first year was largely offset in the following three years. The committee, therefore, modified the method of calculating a taxpayer's base amount in order to enhance the credit's incentive effect. The committee did wish, however, to retain an incremental credit structure in order to maximize the credit's efficiency by not allowing (to the extent possible) credits for research that would have been undertaken in any event.

*   *   *   *   *   *   *

Because businesses often determine their research budgets as a fixed percentage of gross receipts, it is appropriate to index each taxpayer's base amount to average growth in its gross receipts. By so adjusting each taxpayer's base amount, the committee believes the credit will be better able to achieve its intended purpose of rewarding taxpayers for research expenses in excess of amounts which would have been expended in any case. Using gross receipts as an index, firms in fast-growing sectors will not be unduly rewarded if their research intensity, as measured by their ratio of qualified research to gross receipts, does not correspondingly increase. Likewise, firms in sectors with slower growth will still be able to earn credits as long as they maintain research expenditures commensurate with their own sales growth.

[H.R. Rept. No. 101–247, at 1199–1200 (1989), 1989 U.S.C.C.A.N. 1906, 2669.]

---

[6] The 1989 amendments retained the sec. 41(a)(2) 20% basic research payment credit, as well.

[7] In the Ticket to Work and Work Incentives Improvement Act of 1999, Pub. L. No. 106–170, sec. 502(c)(1), 113 Stat. at 1919, Congress expanded the definition of gross receipts of foreign corporations, then set forth in sec. 41(c)(6), for purposes of the sec. 41 credit, to include those effectively connected with the conduct of a trade or business in "the Commonwealth of Puerto Rico, or any possession of the United States."

In 1996 Congress enacted new section 41(c)(4), effective for taxable years beginning after June 30, 1996. Small Business Job Protection Act of 1996, Pub. L. No. 104–188, sec. 1204(c), (f)(2), 110 Stat. at 1774, 1775.[8] That section allows a taxpayer to elect a separate AIRC method of computing the research credit under section 41(a)(1) and establishes a three-tiered formula for making such a computation. As noted *supra*, HP made the AIRC election under section 41(c)(4) for all of the taxable years in issue.

As in effect for and applied to HP's 1999 taxable year, section 41(c)(4) prescribed a credit in an amount equal to the sum of: (i) 1.65% of so much of the QRE from the taxable year as exceeded 1% of HP's AAGR, but did not exceed 1.5% of those AAGR; (ii) 2.2% of so much of the QRE from the taxable year as exceeded 1.5% of HP's AAGR, but did not exceed 2% of those AAGR; and (iii) 2.75% of so much of the QRE for the taxable year as exceeded 2% of HP's AAGR.

For the remaining taxable years in issue, section 41(c)(4) prescribed a credit in an amount equal to the sum of: (i) 2.65% of so much of the QRE from the taxable year as exceeded 1% of HP's AAGR, but did not exceed 1.5% of those AAGR; (ii) 3.2% of so much of the QRE from the taxable year as exceeded 1.5% of HP's AAGR, but did not exceed 2% of those AAGR; and (iii) 3.75% of so much of the QRE from the taxable year as exceeded 2% of HP's AAGR.

In 1998 the Department of the Treasury published in the Federal Register a notice of proposed rulemaking under section 41, endeavoring, in part, to provide guidance on the items of income included in the definition of "gross receipts". Notice of Proposed Rulemaking, 63 Fed. Reg. 66503 (Dec. 2, 1998). Section 1.41–3(c)(1), Proposed Income Tax Regs., 63 Fed. Reg. 66507 (Dec. 2, 1998),[9] provided that "gross receipts", for purposes of section 41 credit calculations, included the "total amount, as determined under the taxpayer's method of accounting, derived by the taxpayer from all its activities and from all sources (e.g., revenues derived

---

[8] Congress also redesignated then sec. 41(c)(5), entitled "Gross receipts", as sec. 41(c)(6), later redesignated as sec. 41(c)(7).

[9] Generally, proposed regulations are afforded no more weight than a position advanced by the Commissioner on brief. *KTA-Tator, Inc. v. Commissioner*, 108 T.C. 100, 102–103 (1997); *F.W. Woolworth Co. v. Commissioner*, 54 T.C. 1233, 1265–1266 (1970).

from the sale of inventory before reduction for cost of goods sold)." [10]

In 2001 the Department of the Treasury promulgated final regulations, adopting, in substantial part, the provisions of the proposed regulations. T.D. 8930, 2001–1 C.B. 433. [11] However, the final regulations, by their own terms, explicitly apply only to taxable years beginning after January 3, 2001. Sec. 1.41–3(e), Income Tax Regs. Furthermore, in promulgating the final regulations, the Department of the Treasury expressly limited their exegetic scope to credit computations for the taxable years following the regulations' effective date (January 3, 2001). T.D. 8930, 2001–1 C.B. at 440 ("No inference should be drawn from the applicability date concerning the application of section 41 to * * * the computation of the base amount before the applicability date."). Consequently, the final regulations provide no guidance in our present inquiry.

HP does suggest, however, that respondent's position in these cases represents an impermissible retroactive application of the regulation. As discussed *infra*, we reject this characterization. Nonetheless, we believe that the Department of the Treasury's logic in embracing a broad definition of "gross receipts" for section 41 computation purposes, articulated in its preamble to the final regulations, equally applies to pre-effective-date taxable years:

When Congress revised the computation of the research credit to incorporate a taxpayer's gross receipts, *neither the statute nor the legislative history defined the term gross receipts, other than to provide that gross receipts for any taxable year are reduced by returns and allowances made during*

---

[10] Sec. 1.41–3(c)(2), Proposed Income Tax Regs., 63 Fed. Reg. 66508 (Dec. 2, 1998), also excluded certain items from the definition, including:

(i) returns or allowances; (ii) receipts from the sale or exchange of capital assets, as defined in section 1221; (iii) repayments of loans or similar instruments (e.g., a repayment of the principal amount of a loan held by a commercial lender); (iv) receipts from a sale or exchange not in the ordinary course of business, such as the sale of an entire trade or business or the sale of property used in a trade or business as defined under section 1221(2); and (v) amounts received with respect to sales tax or other similar state and local taxes, if under the applicable state or local law, the tax is legally imposed on the purchaser of the good or service, and the taxpayer merely collects and remits the tax to the taxing authority.

[11] The final regulations, under sec. 1.41–3(c)(2)(vi), Income Tax Regs., further excluded from the definition of "gross receipts":

Amounts received by a taxpayer in a taxable year that precedes the first taxable year in which the taxpayer derives more than $25,000 in gross receipts other than investment income. For purposes of this paragraph (c)(2)(vi), investment income is interest or distributions with respect to stock (other than the stock of a 20-percent owned corporation as defined in section 243(c)(2).

*the tax year*, and, in the case of a foreign corporation, that only gross receipts effectively connected with the conduct of a trade or business within the United States are taken into account. See section 41(c)(6).

The proposed regulations generally defined gross receipts as the total amount derived by a taxpayer from all activities and sources. However, in recognition of the fact that certain extraordinary gross receipts might not be taken into account when a business determines its research budget, the proposed regulations provided that certain extraordinary items (such as receipts from the sale or exchange of capital assets) would be excluded from the computation of gross receipts.

Several commentators objected to the definition of gross receipts in the proposed regulations. *Referring to the inclusion in a House Budget Report of the term sales growth as an apparent short-hand reference to an increase in gross receipts, some commentators argued that gross receipts should be limited to income from sales. See H.R. Rep. No. 101–247, at 1200 (1989). In determining its research budget, however, a business may take into account any expected income stream, regardless of whether or not the income is derived from sales or from other active business activities. Moreover, many businesses do not generate any income in the form of sales. Accordingly, the final regulations do not adopt this suggestion.*

The final regulations also do not adopt suggestions that the definition of gross receipts be narrowed to exclude those items not directly related to the conduct of the taxpayer's trade or business. *As noted above, any expected income stream may be taken into account in determining a business' research budget, regardless of the source of the income. Moreover, IRS and Treasury believe that a subjective narrowing of the term gross receipts, as suggested by these commentators, could leave the definition of the term, and thus the computation of the base amount, vulnerable to manipulation.*

For example, a narrower definition allowing taxpayers to exclude items not derived in the ordinary course of business might prompt a taxpayer to assert that certain royalties received in the 1980s were derived in the ordinary course of business and are includable as gross receipts (thus decreasing the taxpayer's fixed-base percentage), but that certain interest income received in the years preceding the credit year was not derived in the ordinary course of business and was not includable in gross receipts (thus decreasing the base amount). Nor would a rule of consistency be effective in preventing such manipulation. While the taxpayer described above would be characterizing the nature of its income items as derived or not derived in the ordinary course of a trade or business so as to maximize the amount of the credit, the taxpayer would not be taking inconsistent positions with respect to the same items of income. * * *

[T.D. 8930, 2001–1 C.B. at 434–435; emphasis added.]

## III. *Statutory Interpretation*

### A. *Statutory Language*

The Supreme Court has stated that "'in any case of statutory construction, * * * [its] analysis begins with the language of the statute, * * * . And where the statutory lan-

guage provides a clear answer, it ends there as well'." *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 254 (2000) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)); *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929) ("[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended."). [12] When a word is undefined in a statute, it is a fundamental canon of statutory construction that it will be interpreted as taking its ordinary, contemporary, common meaning. *See Commissioner v. Soliman*, 506 U.S. 168, 174 (1993).

For the taxable years at issue, then section 41(c)(6) provided in part that "gross receipts", for purposes of the section 41 research credit, "shall be reduced by returns and allowances made during the taxable year." The function of the provision was to specify exclusions from "gross receipts"; it offered little clarification concerning the category or categories of receipts included within the definition of the term. No other provision in section 41 filled this ostensible statutory gap.

HP submits that by specifically excluding "returns and allowances", a phrase connoting a merchant business association, Congress evinced a clear intention to limit gross receipts to solely sales receipts. Similarly, citing a Black's Law Dictionary entry, HP asserts that the generally accepted definition of "gross receipts" focuses on sales or services income. *See* Black's Law Dictionary 772 (9th ed. 2009) (defining "gross receipts" as "The total amount of money or other consideration received by a business taxpayer for goods sold or services performed in a taxable year, before deductions. * * * [Sec.] 448; * * * [sec.] 1.448–1T(f)(2)(iv) [Temporary Income Tax Regs., 52 Fed. Reg. 22764 (June 16, 1987)].").

We are unpersuaded by HP's contentions. Nowhere in the Code has the isolated term "gross receipts" been construed as

---

[12] *Cf. Halpern v. Commissioner*, 96 T.C. 895, 899 (1991) ("[W]here a statute is clear on its face, we require unequivocal evidence of legislative purpose before construing the statute so as to override the plain meaning of the words used therein.") (citing *Huntsberry v. Commissioner*, 83 T.C. 742, 747–748 (1984)).

narrowly as HP suggests.[13] On the contrary, an examination of the Federal income tax laws reveals that Congress widely embraces the notion of a broad, inclusive definition for the term. *See, e.g.*, secs. 165(g)(3)(B), 993(f), 1244(c)(1)(C). Indeed, when adopting that term in a provision, Congress often qualifies the term's comprehensive definition through specific exclusions or limitations to accommodate the relevant statutory scheme. *See, e.g.*, secs. 448(c)(3)(C), 509(a)(2)(A)(ii), 1362(d)(3)(B) and (C).[14] If, as proffered by HP, Congress intended to further limit the definition of "gross receipts" in section 41, it undoubtedly recognized the constructional convention by which it had traditionally done so in numerous provisions.

Further, HP's attempt to equate the common meaning of "gross receipts" with the narrow definition Black's Law Dictionary is unavailing. Specifically, the definition provided in Black's Law Dictionary is undermined by the cited authorities, section 448 and section 1.448–1T(f)(2)(iv), Temporary Income Tax Regs., *supra*, from which the definition was purportedly derived. Coincidentally, section 448(c)(3)(C) serves as the most analogous statutory provision to section 41(c)(6), offering nearly identical language. It prescribes that "gross receipts for any taxable year", for purposes of limitations on the use of the cash method of accounting, "shall be reduced by returns and allowances made during such year." Section 1.448–1T(f)(2)(iv), Temporary Income Tax Regs., *supra*, promulgated before the statutory amendment incorporating "gross receipts" into the section 41 credit calculation and effective for all of the taxable years in issue,[15] provides

---

[13] It is a well-established canon of statutory interpretation that "'identical words used in different parts of the same act are intended to have the same meaning.'" *United States Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 460 (1993) (quoting *Commissioner v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159 (1993)). Similarly, the meaning, or ambiguity, of certain words or phrases may become evident only when they are placed in context. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–133 (2000) (citing *Brown v. Gardner*, 513 U.S. 115, 118 (1994)). "'[W]ords of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Id.* at 133 (quoting *Davis v. Mich. Dept. of Treasury*, 489 U.S. 803, 809 (1989)).

[14] At the time sec. 41 was amended to include "gross receipts" in increasing research credit calculations, current sec. 1362(d)(3)(B) and (C) was enacted, in similar form, as sec. 1362(d)(3)(C) and (D), respectively.

[15] Sec. 1.448–1T(f)(2), Temporary Income Tax Regs., 52 Fed. Reg. 22764 (June 16, 1987), was promulgated in 1987. Sec. 7805(e)(2) currently prescribes that temporary regulations expire within three years from the date of issuance; however, this provision applies only to temporary regulations issued after November 20, 1988. Technical and Miscellaneous Revenue Act of 1988,

Continued

that for purposes of section 448(c)(3)(C), "gross receipts" include:

*total sales (net of returns and allowances) and all amounts received for services. In addition, gross receipts include any income from investments, and from incidental or outside sources. For example, gross receipts include interest * * *, dividends, rents, royalties, and annuities, regardless of whether such amounts are derived in the ordinary course of the taxpayer's trade or business.* Gross receipts are not reduced by cost of goods sold or by the cost of property sold if such property is described in section 1221 (1), (3), (4) or (5). *With respect to sales of capital assets as defined in section 1221, or sales of property described in 1221(2) (relating to property used in a trade or business), gross receipts shall be reduced by the taxpayer's adjusted basis in such property.* Gross receipts do not include the repayment of a loan or similar instrument (e.g., a repayment of the principal amount of a loan held by a commercial lender). Finally, gross receipts do not include amounts received by the taxpayer with respect to sales tax or other similar state and local taxes if, under the applicable state or local law, the tax is legally imposed on the purchaser of the good or service, and the taxpayer merely collects and remits the tax to the taxing authority. If, in contrast, the tax is imposed on the taxpayer under the applicable law, then gross receipts shall include the amounts received that are allocable to the payment of such tax. [Emphasis added.]

Clearly then, Black's Law Dictionary's definition of "gross receipts" contradicts its referenced sources. Rather than endorse a circumscribed interpretation of the term, the cited temporary regulation explicitly sets forth several categories of receipts making up a taxpayer's annual "gross receipts". Indeed, dissecting the definition proffered by HP concomitantly with its corresponding sources only serves to strengthen respondent's position.

HP also refers the Court to line 1(a), "Gross receipts or sales", on then-applicable versions of Form 1120 to demonstrate that the Commissioner used those terms interchangeably to describe the same items of income. We are skeptical that a form the Commissioner developed for the effective administration of the Federal income tax laws provides this Court with any implication or guidance in the matter at hand. [16] Moreover, neither the relevant statute nor

---

Pub. L. No. 100–647, sec. 6232(b), 102 Stat. at 3735. Accordingly, the temporary regulation remained valid for all the taxable years in issue.

[16] "[T]he authoritative sources of Federal tax law are in statutes, regulations, and judicial decisions and not in such informal [IRS] publications." *Zimmerman v. Commissioner*, 71 T.C. 367, 371 (1978), *aff'd without published opinion,* 614 F.2d 1294 (2d Cir. 1979); *see also Van Dusen v. Commissioner*, 136 T.C. 515, 531 n.29 (2011); *Mohamed v. Commissioner*, T.C. Memo. 2012–152, 2012 Tax Ct. Memo LEXIS 152, at *29 ("A taxpayer relies on his private interpretation

its attendant legislative history discussed further *infra* refers to Form 1120. Accordingly, we find this assertion irrelevant.

### B. *Legislative History*

HP further asserts that Congress' somewhat inconsistent and, at points, interchangeable use of the terms "sales" and "gross receipts" in describing the 1989 restructuring of the section 41 credit calculation indicates that Congress viewed the two words as coterminous. *See, e.g.*, H.R. Rept. No. 101–247, *supra* at 1199–1200 ("Likewise, firms in sectors with slower growth will still be able to earn credits as long as they maintain research expenditures commensurate with their own sales growth."). In essence, HP requests that the Court construe any purported legislative ambiguity in its favor. While the pertinent legislative history certainly lacks distinctive clarity, it is not completely devoid of language evidencing Congress' true intent.

As noted *supra*, Congress determined that "indexing" research expenditures to average annual growth in gross receipts would "better serve" the credits' "intended purpose of rewarding taxpayers for research expenses in excess of amounts which would have been expended in any case." *Id.* However, if we were to accept HP's assertion that "gross receipts" included only "sales receipts", then we would concomitantly accredit the correlative proposition that Congress intended to extend preferential treatment to companies that did not engage in sales activity. Under HP's interpretation of the credit calculation, it is unlikely that businesses which accrue mainly licensing or investment income would generate substantial AAGR. As a result, such businesses would likely never register a "base amount" exceeding the minimum base amount prescribed by section 41(c)(2). [17] Similarly, if such businesses elected to calculate their research credits under the AIRC computation method prescribed in section 41(c)(4), they would avoid the lower, more credit-limiting tiers of the AIRC credit calculation structure. In both circumstances, taxpayers would enhance their annual research credits and effectively subvert the legislative purpose of the section 41 credit statutory scheme by indexing their allow-

---

of a tax form at his own risk.").

[17] Sec. 41(c)(2) provides: "In no event shall the base amount be less than 50 percent of the qualified research expenses for the credit year."

able credit amount to certain research expenditures that they would have made in any event. Indeed, this interpretation would provide disparate treatment to businesses in the same industry operating under different business models. For instance, a company which merely licensed intellectual property would benefit over a similar entity which, instead, incorporated such property into marketable products for subsequent sale. We find no hint of any congressional intent effectively endorsing such divergent results. *See* H.R. Rept. No. 101–247, *supra* at 1199–1200 ("Because *businesses* often determine their research budgets as a fixed percentage of gross receipts, it is appropriate to index each taxpayer's base amount to average growth in its gross receipts." (Emphasis added.)).

C. *Respondent's Position*

Respondent maintains that HP should include receipts reflected on Form 1120 lines 4 (dividends), 5 (interest), 6 (gross rents), 7 (gross royalty), and 10 (other income) in "gross receipts" for its section 41 calculations for each of the taxable years at issue; however, respondent does not seek to include receipts reflected on Form 1120 line 8 (capital gain net income) or 9 (net gain from the sale of a business) for the same purpose. As noted *supra*, HP counters that this assertion effectively represents an invalid retroactive application of section 1.448–1T(f)(2), Temporary Income Tax Regs., *supra*, to the tax years in issue. We do not construe respondent's position as such. While respondent's nuanced definition of "gross receipts" is not entirely congruent with our discernment of a more comprehensive interpretation of the term, [18] we find that respondent's position simply represents a concession in these cases. Accordingly, we need not further address HP's contention.

D. "*Expressio Unius Est Exclusio Alterius*"

We are cognizant of the venerable rule of statutory construction, commonly referred to as the maxim "expressio unius est exclusio alterius", which dictates: "'Where Congress explicitly enumerates certain exceptions * * * addi-

---

[18] *See Deere & Co. v. Commissioner*, 133 T.C. 246, 253 (2009) (the taxpayer, in determining its "gross receipts" for purposes of its sec. 41 credit, used the domestic income it reported on its Form 1120 line 11, representing the total amount of income listed on lines 3 through 10).

tional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.'" *United States v. Smith*, 499 U.S. 160, 167 (1991) (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–617 (1980)); *see also Catterall v. Commissioner*, 68 T.C. 413, 421 (1977), *aff'd sub nom. Vorbleski v. Commissioner*, 589 F.2d 123 (3d Cir. 1978). Given our understanding of the comprehensive definition of "gross receipts", the sole statutory exclusion from that definition ("returns and allowances"), and a lack of congressional intent indicating otherwise, we do not read any further limitations into the definition of "gross receipts" for purposes of section 41.

### E. *Conclusion*

HP repeatedly requests that the Court heed the oft-cited admonition that "taxing acts 'are not to be extended by implication beyond the clear impact of the language used'" and that "doubts are to be resolved against the government and in favor of the taxpayer." *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 93 (1934). Nonetheless, it is clear that

[t]he intention of the lawmaker controls in the construction of taxing acts as it does in the construction of other statutes, and that intention is to be ascertained, not by taking the word or clause in question from its setting and viewing it apart, but by considering it in connection with the context, the general purposes of the statute in which it is found, the occasion and circumstances of its use, and other appropriate tests for the ascertainment of the legislative will. * * * [*Id.* at 93–94.]

We believe it evident, when considering the statutory language at issue, comparable language in the Code, and the purpose of the research credit statutory scheme, that Congress intended a broad, inclusive definition of the term "gross receipts" for purposes of section 41 credit calculations, not one limited solely to "sales receipts".

### IV. *Conclusion*

On the basis of respondent's concession, we shall grant in part HP's motion for partial summary judgment thus allowing HP to exclude intercompany gross receipts received from CFCs, within the meaning of section 41(f)(5), from its

AAGR when calculating its section 41 credits for all of the taxable years at issue.

We shall also grant in part respondent's motion for partial summary judgment affirming that HP was required to include nonsales income, including dividends, interest, rent, and other income, in its AAGR when calculating its section 41 credits for taxable years 1999 through 2001.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

> *An appropriate order will be issued granting the parties' cross-motions for partial summary judgment in part.*